**GUCOVSCHI LAW FIRM, PLLC.**

Adrian Gucovschi (State Bar No. 360988)
Nathaniel Haim Sari (State Bar No. 362634)
165 Broadway, Fl. 23
New York, NY 10006
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gucovschilaw.com
nathaniel@gucovschilaw.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARISSA PORCUNA, individually and on behalf of all others similarly situated, | Case No. 4:26-cv-7990 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| CHATTEM, INC., | |
| Defendant. | |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................3

PARTIES ...........................................................................................................................7

JURISDICTION AND VENUE ..........................................................................................8

FACTUAL ALLEGATIONS ..............................................................................................8

    A.    Consumer Demand for Delicately Formulated and Fragrance-Free
            Personal Care Products ............................................................................8

    B.    The Products and Defendant's Representations .........................................9

    C.    The Products' Ingredients ......................................................................10

            *i. Fragrance Is an Undisclosed Mixture and a Recognized Contact
                  Allergen* ........................................................................................10

            *ii. Chamomilla Recutita (Matricaria) Flower Extract Functions as a
                  Fragrance and Is a Recognized Contact Allergen* .......................13

            *iii. α-Bisabolol Is a Fragrance Constituent of Chamomile and a
                  Documented Contact Allergen* .....................................................19

            *iv. Limonene and Linalool Are Contact Allergens Identified on
                  FDA's Own List, and Their Sensitizing Potency Increases on
                  the Shelf* ......................................................................................19

            *v. Lavandula Angustifolia (Lavender) Extract Is a Fragrance
                  Material and a Recognized Contact Allergen* .............................21

            *vi. Rosmarinus Officinalis (Rosemary) Leaf Extract Is an Aromatic
                  Botanical That Causes Allergic Contact Dermatitis and
                  Cross-Reacts Within Its Plant Family* .........................................22

            *vii. Acacia Farnesiana Flower Extract Is a Perfumery Material* ...........23

            *viii. Zingiber Officinale (Ginger) Root Extract Is a Fragrance
                  Material That Carries Recognized Fragrance Allergens* .............23

            *ix. Formaldehyde-Releasing Preservatives Are Recognized Contact
                  Allergens Identified on FDA's Own List* .....................................24

            *x. Methylparaben and Propylparaben Are Recognized Contact
                  Allergens* ......................................................................................26

            *xi. Propylene Glycol Is the American Contact Dermatitis Society's
                  Allergen of the Year and Both a Sensitizer and an Irritant* .......26

            *xii. Caprylyl Glycol Is an Emerging Contact Allergen That Routine
                  Screening Does Not Detect* ..........................................................28

            *xiii. Phenoxyethanol Is a Documented Contact Allergen and Contact
                  Urticant* .......................................................................................28

            *xiv. Salicylic Acid, Lactic Acid, and Urea Are Skin Irritants* .................29

            *xv. Quaternary Ammonium Compounds Are Irritants for Which the
                  Industry's Own Panel Has Identified Safety-Data Gaps* ............30

xvi. *Triethanolamine Is the Most Frequent Sensitizer Among Commonly Used Cosmetic Emulsifiers* .................................................. 31

xvii. *Cetearyl Alcohol and Cetyl Alcohol Are Reported Contact Allergens in Leave-On Products* .......................................................... 32

xviii. *Additional Botanical Extracts Compound the Allergen Burden, and Industry Guidance Warns Against Stacking Them* .............................. 32

xix. *Ethylhexylglycerin Is a Reported Contact Allergen* ........................... 34

D.    The Products Are Marketed to Consumers Whose Skin Is Least Able to Tolerate These Ingredients .................................................. 34

E.    Defendant's Representations Are False and Misleading ........................... 36

i. *The Delicate Formulation Representations* ........................................... 36

ii. *The Fragrance Free Representations* ................................................... 36

iii. *The Ingredient Declarations Do Not Cure the Deception* .................... 37

F.    Defendant Knew the Products Did Not Live Up to the Representations .................................................................................... 37

G.    Defendant's Labeling Violates Federal and California Cosmetic Labeling Law ........................................................................................ 39

H.    RULE 9(b) Allegations ......................................................................... 41

I.    Plaintiff Lacks an Adequate Remedy at Law ........................................ 42

CLASS ALLEGATIONS ...................................................................................... 42

CAUSES OF ACTION ......................................................................................... 44

COUNT I ............................................................................................................. 44

VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT ("CLRA") ....................................................................................... 44

COUNT II ............................................................................................................ 45

VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL") ........... 45

COUNT III ........................................................................................................... 47

VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL") ............... 47

COUNT IV ........................................................................................................... 47

VIOLATION OF STATE CONSUMER PROTECTION STATUTES ......................... 47

COUNT V ............................................................................................................ 48

BREACH OF EXPRESS WARRANTY ................................................................... 48

COUNT VI ........................................................................................................... 50

UNJUST ENRICHMENT ...................................................................................... 50

PRAYER FOR RELIEF ......................................................................................... 50

JURY TRIAL DEMANDED .................................................................................. 51

Plaintiff Marissa Porcuna ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Chattem, Inc. ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on her personal knowledge.

## NATURE OF THE ACTION

1.    Plaintiff brings this class action on behalf of herself and all similarly situated consumers who purchased the seventeen Gold Bond lotions, creams, and serums identified in Exhibit A (collectively, the "Products").[1]

2.    On the Products' labels and packaging and in their online marketing, including on Amazon.com, Defendant represents that the Products are "Hypoallergenic," "Dermatologist Tested," "Dermatologist-Developed," "Allergy Tested," suitable for "Sensitive Skin," "Irritated Skin," "Itchy Skin," "Eczema," that it is "Non-Irritating," "Healing," "Soothing," "Comforting," "Calming," providing "Relief," and use a "Gentle Formula," containing "Skin-Loving Ingredients," which are "Science-Backed," and, as to certain Products, contain "No Parabens" (collectively, the "Delicate Formulation Representations").[2] Defendant also represents that certain Products are "Fragrance Free," and/or "Unscented" (the "Fragrance Free Representations," and together with the Delicate Formulation Representations, the "Representations").[3]

3.    Despite those Representations, however, the Products contain numerous recognized contact allergens and skin irritants, including ingredients identified in clinical patch-test literature and industry safety assessments as allergens and irritants. Furthermore, the Products bearing the Fragrance Free Representations either expressly list "Fragrance" in the same ingredient declaration or contain other ingredients documented to function as fragrances, masking agents, or aromatic materials. Below is an illustrative sampling of the Products and the Representations:

---

[1] The Products and their Amazon Standard Identification Numbers ("ASINs") are reproduced in Exhibit A.

[2] The marketing claims associated with each Product, and their placement on the Products' labels and Amazon listings, are reproduced in Exhibit A.

[3] The specific Products bearing the Fragrance Free Representations are identified in Exhibits A.

**FRONT AND BACK LABEL**



**Front label · carousel image #1**

Front label packshot - white pump bottle, "HEALING HYDRATING LOTION ALOE," "VALUE SIZE 70% MORE," "IMMEDIATE HYDRATION THAT LASTS 24 HRS."

Rectangles added by counsel around the claim words "HEALING" — colour-coded to the legend. The photograph is otherwise unaltered.



**Back label · carousel image #2 — CLAIM**

Back label close-up on dark blue background, showing the claim block above the printed ingredient list.

On-image text: "Aloe Helps Soothe & Comfort the Skin"; "Non-Greasy - Dermatologist-Tested"; "NO PARABENS, PHTHALATES, DYES"; ingredient block ending "... disodium EDTA, fragrance"

Rectangles added by counsel around the claim words "Soothe & Comfort", "Dermatologist-Tested" — colour-coded to the legend. The photograph is otherwise unaltered.



#8 · Claims icon slide on dark blue background with three icon call-outs. — CLAIM

On-image text: "FRAGRANCE-FREE"; "NON-GREASY"; "HYPOALLERGENIC"

**INGREDIENTS (AS LISTED ON THE SAME PAGE)**

Water, Glycerin, Petrolatum, Dimethicone, Cetyl Alcohol, Jojoba Esters, Aloe Barbadensis Leaf Juice, Stearyl Alcohol, Distearyldimonium Chloride, Cetearyl Alcohol, Steareth-2, Steareth-21, Propylene Glycol, Chamomilla Recutita (Matricaria) Flower Extract, Polysorbate 60, Stearamidopropyl PG-Dimonium Chloride Phosphate, Methyl Gluceth-20, Hydroxyacetophenone, Tocopheryl Acetate, Magnesium Ascorbyl Phosphate, Niacinamide, Hydrolyzed Jojoba Esters, Glyceryl Stearate, Citric Acid, Disodium EDTA, Fragrance.

26 ENTRIES AS PRINTED · 8 AT ISSUE

## Gold Bond Healing Overnight Body & Face Lotion, 13 oz

**ASIN:** B0DR36KSZ4  ·  Main image carousel: 9 still images reviewed. 2 of 9 frames bear at-issue claim text (outlined in gold).

### FRONT AND BACK LABEL



**Front label · carousel image #1**

front of white pump bottle, Healing Overnight Body & Face Lotion facing camera

On-image text: Restoring Aloe • Calming Lavender | Antioxidant-Rich Melatonin | CLINICALLY SHOWN TO VISIBLY HEAL DRY SKIN IN JUST 1 NIGHT

Rectangles added by counsel around the claim words "HEALING", "Calming Lavender", "HEAL DRY SKIN" — colour-coded to the legend. The photograph is otherwise unaltered.



**Back label · carousel image #3 — CLAIM**

back label of bottle, full claim panel and ingredient list visible

On-image text: 81% WOKE UP TO HYDRATED, SOFT & SMOOTH SKIN | Hypoallergenic & Dermatologist Tested | Non-Greasy • Won't Clog Pores • Cruelty Free

Rectangles added by counsel around the claim words "heal &", "Hypoallergenic", "HEALING" — colour-coded to the legend. The photograph is otherwise unaltered.

### INGREDIENTS (AS LISTED ON THE SAME PAGE)

water, glycerin, hydroxyethyl urea, butyrospermum parkii (shea) butter extract, cocos nucifera (coconut) oil, jojoba esters, gluconolactone, niacinamide, petrolatum, steareth-21, cetyl alcohol, distearyldimonium chloride, aloe barbadensis leaf juice, behentrimonium methosulfate, glyceryl stearate, stearyl alcohol, lavandula angustifolia (lavender) extract, chamomilla recutita (matricaria) flower extract, sodium hyaluronate, melatonin, dimethicone, theobroma cacao (cocoa) seed butter, rosmarinus officinalis (rosemary) leaf extract, zingiber officinale (ginger) root extract, acacia farnesiana flower extract, hydrolyzed jojoba esters, ceramide NP, ceramide NS, ceramide EOS, ceramide EOP, ceramide AP, hydroxyacetophenone, bisabolol, tocopheryl acetate, 3-O-ethyl ascorbic acid, caprooyl phytosphingosine, caprooyl sphingosine, stearamidopropyl PG-dimonium chloride phosphate, cholesterol, ceteareth-25, behenic acid, butylene glycol, propylene glycol, isopropyl myristate, potassium hydroxide, ethylhexylglycerin, disodium EDTA, fragrance

48 ENTRIES AS PRINTED · 15 AT ISSUE

**FRONT AND BACK LABEL**





**Front label · carousel image #1**

front of white tube, Healing Hand Cream Aloe, facing camera

Rectangles added by counsel around the claim words "HEALING" — colour-coded to the legend. The photograph is otherwise unaltered.

**Back label · carousel image #2 — CLAIM**

back label of tube, full claim panel and ingredient list visible

On-image text: POSITIVE IONS KEEP MOISTURE ATTACHED TO THE SKIN, EVEN AFTER YOU WASH YOUR HANDS | Aloe Helps Soothe & Comfort the Skin | Non-Greasy | Dermatologist-Tested • Light Fresh Scent

Rectangles added by counsel around the claim words "HEALING", "Soothe & Comfort", "Dermatologist-Tested", "Scent", "fragrance,", "HEAL" — colour-coded to the legend. The photograph is otherwise unaltered.



#8 · four-icon claim grid: crossed-out perfume bottle, crossed-out droplet, checked droplet, checked shield — CLAIM

On-image text: FRAGRANCE-FREE | NON-GREASY | HYPOALLERGENIC | DERMATOLOGIST TESTED

**INGREDIENTS (AS LISTED ON THE SAME PAGE)**

Water, Glycerin, Dimethicone, Petrolatum, Jojoba Esters, Cetyl Alcohol, Aloe Barbadensis Leaf Juice, Stearyl Alcohol, Distearyldimonium Chloride, Cetearyl Alcohol, Steareth-2, Steareth-21, Propylene Glycol, Chamomila Recutita (Matricaria) Flower Extract, Polysorbate 60, Stearamidopropyl PG-Dimonium Chloride Phosphate, Methyl Gluceth-20, Tocopheryl Acetate, Magnesium Ascorbyl Phosphate, Hydrolyzed Collagen, Hydrolyzed Elastin, Retinyl Palmitate, Hydrolyzed Jojoba Esters, Glyceryl Stearate, EDTA, Fragrance, Potassium Hydroxide, Diazolidinyl Urea, Methylparaben.

29 ENTRIES AS PRINTED · 9 AT ISSUE

4.      Defendant's Representations are not just misleading; they are literally false. Accordingly, Plaintiff brings claims against Defendant for violations of (1) California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; (2) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (3) California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; (4) state consumer-protection statutes; (5) breach of express warranty; and (6) unjust enrichment.

## PARTIES

5.      Plaintiff Marissa Porcuna is a citizen of California residing in Bay Point, California. On March 18, 2026, Plaintiff purchased the Unscented variant of Gold Bond Healing Hydrating Body Lotion with Aloe, for her personal use through Amazon.com.[4] Before making her purchase, Plaintiff saw and relied on Defendant's representations that the Product was "Hypoallergenic," "Dermatologist-Tested," "Healing," formulated to "Soothe & Comfort," "Fragrance-Free," and "Unscented." Based on those representations, Plaintiff understood that the Product was gentle, formulated to reduce the likelihood of allergic reactions and irritation, and free from fragrance and other ingredients that function as fragrance. Plaintiff relied on the Representations in deciding to purchase the Product, and they were part of the basis of her bargain. Plaintiff would not have purchased the Product on the same terms, and would have paid less for it, had she known the Representations were false or misleading.

6.      Plaintiff continues to purchase lotions and other skin-care products and remains interested in purchasing Products that are in fact delicately formulated and free from ingredients that function as fragrance. But Plaintiff cannot determine whether Defendant has corrected, or will correct, the challenged Representations or reformulated the Products. If Defendant continues to make the Representations, Plaintiff will be unable to rely on them when deciding whether to purchase the Products and faces a real and immediate threat of being misled again.

---

[4] Amazon.com: Gold Bond Healing Hydrating Body Lotion with Aloe, Moisturizer for Dry to Extra Dry Skin, 24-HR Hydration to Soothe & Comfort, Non-Greasy, Dermatologist-Tested, Light Scent, 24 Oz Family Size Pump : Beauty & Personal Care (last accessed July 31, 2026).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    7

7.     Defendant Chattem, Inc. is a Tennessee corporation with its principal place of business in Chattanooga, Tennessee. Defendant manufactures, labels, advertises, markets, distributes, and/or sells the Products throughout California and the United States. Defendant controlled and supplied the challenged Product representations and ingredient information.

## JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A), because this is a class action in which the aggregate claims of the proposed Classes exceed $5,000,000, exclusive of interest and costs; the proposed Classes contain at least 100 members; and at least one member of the proposed Classes is a citizen of a state different from Defendant.

9.     This Court has personal jurisdiction over Defendant because Defendant conducts and transacts substantial business in California and in this District, purposefully directs the challenged labeling and marketing to California consumers, and sells the Products in this District. Furthermore, a substantial portion of the events giving rise to Plaintiff's claims occurred in this District, including Plaintiff's purchase of the Product while residing in Bay Point, California.

10.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant conducts substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims occurred here.

## FACTUAL ALLEGATIONS

**A.     Consumer Demand for Delicately Formulated and Fragrance-Free
Personal Care Products**

11.     Consumers increasingly seek out and rely on representations that personal-care products are hypoallergenic, dermatologist tested, gentle, appropriate for sensitive or eczema-prone skin, non-irritating, soothing, and fragrance free. Allergic contact dermatitis affects a substantial portion of the population, and the prevalence of dermatitis attributed to personal-care products has increased materially over time.[5]

---

[5] See American Academy of Allergy, Asthma & Immunology, *Contact Dermatitis Overview*, https://www.aaaai.org/tools-for-the-public/conditions-library/allergies/contact-dermatitis-overview

12. Fragrances and preservatives are among the most clinically significant allergen classes in cosmetics and personal-care products.[6] The risk of irritation and sensitization is especially material for consumers with dry, cracked, eczema-prone, diabetic, or otherwise compromised skin barriers—the consumers to whom Defendant directs many of the Products.

13. Peer-reviewed research has identified potential contact allergens in products marketed as "hypoallergenic," including fragrance and baseline-series allergens.[7] The FDA likewise recognizes that consumers may understand products called "hypoallergenic" to produce fewer allergic reactions and to be gentler than competing products.[8]

14. Defendant capitalizes on those consumer expectations by marketing the Products through the Delicate Formulation and Fragrance Free Representations. Those representations are material because they communicate that Defendant selected and formulated the Products' ingredients with the needs of allergy-conscious, irritation-conscious, sensitive-skin, eczema-prone, and fragrance-avoiding consumers in mind.

**B.    The Products and Defendant's Representations**

15. Defendant manufactures, markets, and sells the seventeen Products online, including Amazon.com, and retail stores across the nation.

---

(last updated Dec. 11, 2023); Bickers D.R., et al., *The Burden of Skin Diseases: 2004*, 55 J. Am. Acad. Dermatol. 490 (2006); Warshaw E.M., et al., *Contact Dermatitis to Personal Care Products Is Increasing (But Different!) in Males and Females: North American Contact Dermatitis Group Data, 1996–2016*, 85 J. Am. Acad. Dermatol. 1446 (2021).

[6] See *Allergic Contact Dermatitis to Preservatives and Fragrances in Cosmetics*, Skin Therapy Letter (2011), https://www.skintherapyletter.com/allergic-contact-dermatitis/cosmetics/; *Trends in Contact Allergy to Preservatives From 2014 to 2023*, Contact Dermatitis (2025), PMID 40443262.

[7] Hiranput S., McAllister L., Hill G. & Yesudian P.D., *Do Hypoallergenic Skincare Products Contain Fewer Potential Contact Allergens?*, 49 Clin. Exp. Dermatol. 386 (2024), https://doi.org/10.1093/ced/llad436.

[8] FDA, *"Hypoallergenic" Cosmetics*, https://www.fda.gov/cosmetics/cosmetics-labeling-claims/hypoallergenic-cosmetics.

---

16. Defendant markets the Delicate Formulation Representations and Fragrance Free Representations on the Products' labels, as well as on its Amazon.com Product titles, carousel images, and the Products' descriptions.[9]

17. Despite the Representations, the Products contain the fragrance ingredients, fragrance-function botanicals, contact allergens, preservatives, glycols, acids, surfactants, and other irritants described below. The particular ingredients declared for each Product are identified in Exhibit A.

## C. The Products' Ingredients

18. The Products' ingredients include an ingredient listed only as "fragrance," multiple botanical extracts that function as fragrances and that carry recognized fragrance allergens, three formaldehyde-releasing preservatives, and numerous additional recognized contact allergens and skin irritants. Each is described below.

### i. Fragrance Is an Undisclosed Mixture and a Recognized Contact Allergen

19. Several of the Products list "fragrance" as an ingredient. The term "fragrance" as it appears on a cosmetic ingredient label is not a single substance. It is a legally sanctioned catch-all term that conceals a proprietary mixture of chemical compounds—potentially dozens, or even hundreds, of individual ingredients. Under federal law, manufacturers are not required to disclose the individual constituent chemicals within their fragrance formulations.[10] As a result, when a consumer reads the word "fragrance" on a personal care product label, the individual chemical composition of that fragrance—including whether its constituent chemicals include recognized allergens—is not apparent.

---

[9] Although the precise wording varies by Product, the claims, individually and collectively, communicate the materially similar Delicate Formulation and Fragrance Free Representations message alleged herein.

[10] FDA, *Fragrances in Cosmetics*, https://www.fda.gov/cosmetics/cosmetic-ingredients/fragrances-cosmetics ("under U.S. regulations, fragrance and flavor ingredients can be listed simply as 'Fragrance' or 'Flavor'"; "Fragrance and flavor formulas are complex mixtures of many different natural and synthetic chemical ingredients"); see 21 C.F.R. § 701.3(a) (cosmetic ingredients must be declared in descending order of predominance, "except that fragrance or flavor may be listed as fragrance or flavor").

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                      10

20.     Fragrance is among the most clinically significant contact allergens in personal care products. The American Academy of Dermatology identifies fragrance as one of the most common causes of allergic contact dermatitis, and fragrance is recognized in the dermatology literature as the most frequent cause of contact allergy to cosmetic products.[11] The American Contact Dermatitis Society named fragrance the "Allergen of the Year" in 2007,[12] and the FDA has acknowledged that "[s]ome components of fragrance formulas may have a potential to cause allergic reactions or sensitivities for some people."[13] The Modernization of Cosmetics Regulation Act of 2022 ("MoCRA") has since provided FDA with a specific statutory mandate to identify fragrance allergens and require their disclosure on cosmetic product labels—enacted in direct recognition of the allergen risk posed by undisclosed fragrance ingredients in personal care products.[14] In a large multicentre series of patients with fragrance-mix sensitization, fragrance mix I produced positive reactions in 11.5% to 12.1% of patients tested in North America.[15]

21.     A 2025 peer-reviewed study published in *Toxicological Research* confirmed that while essential oils consist of approximately 50–500 naturally occurring compounds, "synthetic scents may comprise more than 3,000 distinct chemical compounds"—making the single label

[11] American Academy of Dermatology, *Contact Dermatitis*, https://www.aad.org/public/diseases/eczema/contact-dermatitis; see also Johansen JD, *Fragrance contact allergy: a clinical review*, Am. J. Clin. Dermatol. 2003;4(11):789–98; Cheng J, Zug K, *Fragrance Allergic Contact Dermatitis*, Dermatitis 2014;25(5):232–45 (fragrance is the most frequent cause of contact allergy to cosmetic products).

[12] American Contact Dermatitis Society, *Allergen of the Year 2007: Fragrance*; see also Jacob SE, Castanedo-Tardan MP, *A review of the U.S. standard patch test series 2007*, Pediatr. Ann. 2008;37(2):102–103.

[13] FDA, *Fragrances in Cosmetics*, https://www.fda.gov/cosmetics/cosmetic-ingredients/fragrances-cosmetics ("Some components of fragrance formulas may have a potential to cause allergic reactions or sensitivities for some people").

[14] 21 U.S.C. § 364e(b) (FDCA § 609(b), as added by MoCRA) (requiring the responsible person to identify on a cosmetic product label each fragrance allergen included in such cosmetic product, as defined by FDA rulemaking); see also FDA Unified Regulatory Agenda, *Disclosure of Fragrance Allergens in Cosmetic Labeling*, RIN 0910-AI90.

[15] Zug KA, et al., *Patch-test results of the North American Contact Dermatitis Group 2005-2006*, Dermatitis (2009), PMID 19470301 (n = 4,454; fragrance mix I 11.5%); Warshaw EM, et al., *Patch test results of the North American Contact Dermatitis Group 2011-2012*, Dermatitis (2015), PMID 25581671 (n = 4,238; fragrance mix I 12.1%).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                     11

"fragrance" on a Product represented as "Hypoallergenic" materially misleading to reasonable consumers.[16]

22.    Fragrance supplies no moisturizing or therapeutic function in a lotion or cream; it is included for scenting or masking purposes and sensory appeal. Indeed, Defendant itself markets certain of the Products as "Fragrance Free" and "Unscented," demonstrating both that added fragrance is unnecessary to the Products' moisturizing or therapeutic function and that Defendant is aware fragrance presents an allergen concern. Defendant nonetheless declares "fragrance" on the ingredient lists of Products that it simultaneously represents to be "Hypoallergenic."

23.    The FDA has stated that there is "no federal standard or definition that governs the use of" the terms "hypoallergenic," "fragrance-free," or "for sensitive skin" in the United States.[17] The FDA has likewise explained that a product labeled "unscented" may in fact contain a fragrance added to mask the odor of other ingredients.[18]

24.    FDA explains that manufacturers use the term "hypoallergenic" to claim that their cosmetics produce fewer allergic reactions than other cosmetics, that consumers with hypersensitive or even "normal" skin may be led to believe such products will be gentler, and that the term "may have considerable market value in promoting cosmetic products to consumers on a retail basis."[19]

---

[16] Rana P, et al., *Regulatory frameworks for fragrance safety in cosmetics: a global overview*, 41(3) Toxicol. Res. 199–220 (2025), PMC12021755 ("EOs consist of around 50–500 naturally occurring compounds that are found in a plant whereas synthetic scents may comprise more than 3,000 distinct chemical compounds").

[17] FDA, *Allergens in Cosmetics*, https://www.fda.gov/cosmetics/cosmetic-ingredients/allergens-cosmetics ("It isn't enough to check for terms like 'hypoallergenic', 'fragrance-free' or 'for sensitive skin,' as there is no federal standard or definition that governs the use of these terms in the U.S."); FDA, *"Hypoallergenic" Cosmetics*, https://www.fda.gov/cosmetics/cosmetics-labeling-claims/hypoallergenic-cosmetics (explaining that manufacturers use "hypoallergenic" to claim that their cosmetics produce fewer allergic reactions, that consumers with hypersensitive or even "normal" skin may be led to believe such products will be gentler, and that the term "may have considerable market value in promoting cosmetic products to consumers on a retail basis"; identifying the information as current and updated only as needed).

[18] FDA, *Fragrances in Cosmetics*, https://www.fda.gov/cosmetics/cosmetic-ingredients/fragrances-cosmetics (a product represented as "unscented" may nonetheless contain a fragrance ingredient included to mask the odor of other ingredients rather than to impart a scent).

[19] FDA, *Allergens in Cosmetics*, https://www.fda.gov/cosmetics/cosmetic-ingredients/allergens-cosmetics ("It isn't enough to check for terms like 'hypoallergenic', 'fragrance-free' or 'for sensitive skin,' as there is no federal standard or definition that governs the use of these terms in the U.S."); FDA, *"Hypoallergenic" Cosmetics*, https://www.fda.gov/cosmetics/cosmetics-labeling-claims/hypoallergenic-cosmetics (explaining that manufacturers use "hypoallergenic" to claim that

---

That recognized consumer understanding and retail significance reinforce the materiality of Defendant's Delicate Formulation Representations.

### ii. Chamomilla Recutita (Matricaria) Flower Extract Functions as a Fragrance and Is a Recognized Contact Allergen

25.     Several of the Products contain Chamomilla Recutita (Matricaria) Flower Extract—German chamomile flower extract—including Products that Defendant represents to be "Hypoallergenic," "fragrance free," and "Unscented."

26.     Chamomilla Recutita (Matricaria) Flower Extract contains a volatile oil whose principal constituents—(−)-α-bisabolol and its oxides and chamazulene, together with related sesquiterpenes—are responsible for chamomile's characteristic sweet, herbaceous aroma. COSMILE Europe classifies Chamomilla Recutita Flower Extract as a "Fragrance" ingredient and identifies its preparation type as "Extract (solvent extract)."[20] Commercial cosmetic-grade chamomile flower extracts are standardly prepared in solvent bases—including propylene glycol, glycerin, and butylene glycol—specifically to preserve and deliver the bioactive terpenoids bisabolol, bisabolol oxides A and B, and chamazulene that give chamomile its characteristic herbaceous aroma.[21] The Good Scents Company, an authoritative industry fragrance-and-flavor

their cosmetics produce fewer allergic reactions, that consumers with hypersensitive or even "normal" skin may be led to believe such products will be gentler, and that the term "may have considerable market value in promoting cosmetic products to consumers on a retail basis"; identifying the information as current and updated only as needed).

[20] COSMILE Europe, *Chamomilla Recutita Flower Extract* (functions "FRAGRANCE: Enhances the smell of a product and/or perfumes the skin" and "SKIN CONDITIONING"; preparation type "Extract (solvent extract)"), https://cosmileeurope.eu/inci/detail/3041/chamomilla-recutita-flower-extract.

[21] Nature In Bottle, *Chamomile Extract—Matricaria recutita* (describing commercial cosmetic chamomile extracts as prepared via solvent-based systems including propylene glycol, glycerin, butylene glycol, and water "customized to fit individual requirements," and noting the extract "acts as a fragranced ingredient with masking properties"), https://www.natureinbottle.com/product/chamomile_extract; UL Prospector, *Chamomile Extract* (listing commercial cosmetic-grade chamomile extract as containing "bisabolol, bisabolol oxides A and B, and matricin" in a glycerin and water carrier), https://www.ulprospector.com/en/na/PersonalCare/Detail/34148/1013931/Chamomile-Extract; see also Srivastava J.K., et al., *Extraction, Characterization, Stability and Biological Activity of Flavonoids Isolated from Chamomile Flowers*, 1 Molecular & Cellular Pharmacology 138, 138–39 (2009), https://pmc.ncbi.nlm.nih.gov/articles/PMC2809371/ (bisabolol, bisabolol oxides, and chamazulene are the principal aromatic volatile constituents of the chamomile flower and are recovered in solvent-based extracts).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    13

database, describes chamomile extract (CAS 84082-60-0) as having a "herbal type odor" and lists its functional use as a cosmetic fragrance and flavor agent.[22] Consistent with this classification, chamomile extracts are among the most prevalent botanical allergens in leave-on personal care products: a peer-reviewed survey of 178 facial wipes found chamomile extracts present in 27.0% of products examined, the second-highest rate of any botanical, and classified them as potential allergens of botanical origin alongside "fragrance" as a separate category—supporting an inference that industry formulation practice treats chamomile extract as a distinct scent-contributing botanical ingredient rather than an inert additive.[23]

27.     Chamomile flower extract functions as a fragrance. The Cosmetic Ingredient Review ("CIR") Expert Panel, in its amended safety assessment of chamomile-derived ingredients, states that "[t]he Chamomilla recutita-derived ingredients in this assessment are reported to function mostly as fragrance ingredients and skin conditioning agents in cosmetic products," and the Panel's ingredient-function table lists Chamomilla Recutita (Matricaria) Flower Extract [CAS No. 84082-60-0] among the ingredients whose designated functions include "fragrance ingredients."[24] This characterization reflects data reported by cosmetic manufacturers to the FDA's Voluntary Cosmetic Registration Program identifying how chamomile-derived ingredients are actually used in the

---

[22] The Good Scents Company, *Matricaria chamomilla Flower Extract* (CAS 84082-60-0) (listing functional use as "cosmetic, flavor and fragrance agents" and describing "herbal type odor"), https://www.thegoodscentscompany.com/data/ex1547201.html.

[23] Aschenbeck K.A. & Warshaw E.M., *Allergenic Ingredients in Facial Wet Wipes*, 28 Dermatitis 353 (2017), PMID 28338538, DOI 10.1097/DER.0000000000000268 (in survey of 178 facial wipes, "[t]he top potential allergens of botanical origin included Aloe barbadensis (41.0%), chamomile extracts (27.0%), tea extracts (21.3%)"; chamomile classified as a "potential allergen[] of botanical origin" separately from the ingredient category "fragrance," which was present in 63.5% of products).

[24] Johnson W., et al., *Amended Safety Assessment of Chamomilla recutita-Derived Ingredients as Used in Cosmetics*, 37 Int'l J. Toxicology (Supp. 3) 51S, 51S (2018), https://journals.sagepub.com/doi/10.1177/1091581818801814 (chamomile-derived ingredients "reported to function mostly as fragrance ingredients and skin conditioning agents in cosmetic products"); CIR ingredient-function table listing "Chamomilla Recutita (Matricaria) Flower Extract [84082-60-0]" with designated functions including "Fragrance ingredients; skin-conditioning agents-miscellaneous; skin-conditioning agents-occlusive," https://www.cir-safety.org/sites/default/files/chamomilla%20recutita.pdf. The CIR's "reported to function" language reflects use data submitted by manufacturers to the FDA's Voluntary Cosmetic Registration Program ("VCRP"), which compiles how ingredients are actually used in marketed products; it represents a record of industry commercial practice, not a hedged opinion as to the ingredient's chemistry.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                              14

industry—not a theoretical classification, but a record of commercial practice. European cosmetic ingredient databases classify it the same way: COSMILE Europe lists the cosmetic functions of Chamomilla Recutita Flower Extract as "Fragrance"—defined as "enhanc[ing] the smell of a product and/or perfum[ing] the skin"—and "Skin Conditioning," and databases drawn from the EU's CosIng nomenclature list its functions as "masking" and "skin conditioning," where "masking" denotes an ingredient used to reduce or inhibit a product's basic smell—a function that itself presupposes that the ingredient interacts with and contributes to the product's olfactory profile, whether by adding, modifying, or suppressing scent.[25] Under either the COSMILE "Fragrance" designation or the CosIng "masking" designation, chamomile flower extract is not an olfactorily inert ingredient. The Cosmetic Ingredient Review is an industry-funded safety-review body rather than a regulatory authority, the FDA takes "CIR reviews into consideration when we evaluate cosmetic ingredient safety."[26]

28.     Chamomile is also a recognized contact sensitizer. German chamomile belongs to the Compositae (Asteraceae) plant family, which the dermatological literature identifies as an important cause of allergic plant contact dermatitis, with sesquiterpene lactones as the principal sensitizing agents.[27] German chamomile extract is a named component of the Compositae Mix II patch-test panel used in clinical practice to diagnose allergic contact dermatitis, and clinical guidance advises

[25] INCIDecoder, *Chamomilla Recutita Flower Extract* (CosIng-derived functions "masking, skin conditioning"), https://incidecoder.com/ingredients/chamomilla-recutita-flower-extract. Under EU cosmetic ingredient classification, "masking" is defined as reducing or inhibiting the basic smell or taste of the product. COSMILE Europe is operated by Cosmetics Europe and is distinct from the European Commission's official CosIng database, which the Commission describes as having "informative purpose and no legal value." An ingredient with a "masking" function is one whose olfactory activity is sufficient to modify a product's scent; it cannot be olfactorily inert.

[26] The CIR Expert Panel was established in 1976 by what is now the Personal Care Products Council, with FDA and the Consumer Federation of America as non-voting liaisons; it is an independent nonprofit safety-review body, not a regulatory authority. The FDA "may consider" CIR reviews but "does not vote" and "may agree or disagree" with its conclusions. See FDA, *Product Testing of Cosmetics*, https://www.fda.gov/cosmetics/cosmetics-science-research/product-testing-cosmetics; CIR, *About CIR*, https://www.cir-safety.org/about.

[27] Evy Paulsen, *Contact sensitization from Compositae-containing herbal remedies and cosmetics*, 47 Contact Dermatitis 189, 189 (2002), PMID 12492516 ("The Compositae (Asteraceae) family of plants is currently an important cause of allergic plant contact dermatitis in Europe"); DermNet NZ, *Compositae Allergy* (identifying sesquiterpene lactones as the most important allergens in Compositae plants), https://dermnetnz.org/topics/compositae-allergy.

patients who test positive for Compositae allergy to avoid personal-care products that list German chamomile among their ingredients.[28] In the largest published series of botanical contact allergy—15,980 patients patch tested over twenty-seven years—Compositae plants ranked second among the twenty-one botanical allergens identified, behind only *Myroxylon pereirae* (balsam of Peru), and the authors concluded that "[t]opical herbal remedies should not be applied on damaged skin, as multiple sensitization may develop."[29] More than one-third of patients with Compositae allergy also have an allergy to fragrances, balsam of Peru, and/or rosin—all substances of plant origin that are chemically related to Compositae allergens—meaning that the consumer population sensitized to chamomile substantially overlaps with the population sensitized to botanical fragrances and their chemical relatives.[30] Consumers who seek out "hypoallergenic" and "fragrance-free" products are disproportionately drawn from this sensitized population and rely on such labeling specifically to avoid the contact dermatitis triggered by fragrance-related botanical compounds. In a peer-reviewed

[28] European Society of Contact Dermatitis, *Patient Information Leaflet: Compositae Mix II*, https://escd.org/wp-content/uploads/Compositae-mix-II.pdf (listing Chamomilla recutita (German chamomile) extract as a component of Compositae Mix II); Chemotechnique Diagnostics, *Compositae Mix II* (mix includes Chamomilla Recutita, used "for the detection of compositae allergy"), https://www.chemotechnique.se/products/mixes/compositae-mix-ii-557923975/; Contact Dermatitis Institute, *Compositae Mix Patient Information* (advising patients who test positive to avoid products listing "German chamomile," "Matricaria chamomilla L.," or "German chamomile extract"), https://www.contactdermatitisinstitute.com/pdfs/allergens/Compositae%20mix.pdf.

[29] Gilissen L., Huygens S. & Goossens A., *Allergic contact dermatitis caused by topical herbal remedies: importance of patch testing with the patients' own products*, 78 Contact Dermatitis 177 (2018), PMID 29214642, DOI 10.1111/cod.12939 (n = 15,980 patients patch tested over 27 years; of twenty-one botanical allergens identified, "the commonest being Myroxylon pereirae (balsam of Peru), Compositae plants, and tincture of benzoin"; "Topical herbal remedies should not be applied on damaged skin, as multiple sensitization may develop"; and "some did not react to the commercial allergens but only to the products used"). The authors report that 0.8% of the 15,980 patients reacted to herbal remedies; the allegation here concerns Compositae's rank among botanical allergens, not its prevalence among all patients tested.

[30] DermNet NZ, *Compositae Allergy* ("more than one-third of patients with Compositae allergy also have allergy to fragrances, balsam of Peru and rosin (colophony). These are also of plant origin and contain several of the same chemical groups as Compositae plants"), https://dermnetnz.org/topics/compositae-allergy. Balsam of Peru is itself a well-characterized botanical fragrance-related allergen: a positive patch test to balsam of Peru is seen in approximately 50% of fragrance allergy cases. See DermNet NZ, *Balsam of Peru Contact Allergy*, https://dermnetnz.org/topics/balsam-of-peru-allergy. The co-reactivity between Compositae sensitization and fragrance/balsam-of-Peru/rosin sensitization thus reflects a shared chemical basis among plant-origin compounds, not incidental association, and further confirms that the population sensitized to chamomile substantially overlaps with the population that seeks fragrance-free products.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                        16

study, 8 of 12 chamomile-sensitive patients tested positive to chamomile-containing topical preparations, and the authors concluded that "Compositae-allergic persons should be warned against topical use of Compositae-containing products."[31] The Cosmetic Ingredient Review Expert Panel has concluded that *Chamomilla recutita*-derived ingredients are safe in cosmetics only "when formulated to be nonsensitizing."[32] The dermatological literature further reports that chamomile imported from Argentina may contain larger amounts of the strongly allergenic sesquiterpene lactone anthecotulide, although reported content varies by geographic origin and preparation.[33] Separate

[31] Paulsen E., Christensen L.P. & Andersen K.E., *Cosmetics and herbal remedies with Compositae plant extracts — are they tolerated by Compositae-allergic patients?*, 58 Contact Dermatitis 15, 15–16 (2008), PMID 18154553 (8 of 12 chamomile-sensitive patients tested positive to chamomile-containing preparations; "Compositae-allergic persons should be warned against topical use of Compositae-containing products").

[32] Johnson W., Jr., Boyer I., Bergfeld W.F., et al., *Amended Safety Assessment of Chamomilla recutita-Derived Ingredients as Used in Cosmetics*, 37 Int'l J. Toxicology (Supp. 3) 51S–79S (2018), https://doi.org/10.1177/1091581818801814 (concluding that the assessed ingredients are safe in cosmetics in the described practices of use and concentrations "when formulated to be nonsensitizing"; reporting that chamomile imported from Argentina may contain larger amounts of strongly allergenic anthecotulide and may be contaminated with morphologically similar dog fennel, while European-origin chamomile reportedly contains only traces); Paulsen E., *Contact Sensitization from Compositae-Containing Herbal Remedies and Cosmetics*, 47 Contact Dermatitis 189, 189–98 (2002), PMID 12492516; Avonto C., Rua D., Lasonkar P.B., Chittiboyina A.G. & Khan I.A., *Identification of a Compound Isolated from German Chamomile (Matricaria chamomilla) with Dermal Sensitization Potential*, 318 Toxicology & Applied Pharmacology 16, 16–22 (2017), PMID 28109818, DOI 10.1016/j.taap.2017.01.009 (isolating three candidate sensitizers from tested German-chamomile fractions; finding tonghaosu non- to weakly reactive when fresh but more reactive after aging; and finding that its strongly reactive spirolactone degradation product was a potential skin sensitizer in the murine local lymph node assay). Neither the CIR discussion nor the Avonto study tested any Gold Bond Product or Defendant's chamomile extract, and neither establishes that the extract used in any Product contains anthecotulide, tonghaosu, or the tonghaosu degradation product. One Avonto coauthor was affiliated with FDA's Center for Food Safety and Applied Nutrition, and FDA identifies the paper among its collaborative cosmetics-allergen research, but the article is not an FDA agency determination or conclusion.

[33] Johnson W., Jr., Boyer I., Bergfeld W.F., et al., *Amended Safety Assessment of Chamomilla recutita-Derived Ingredients as Used in Cosmetics*, 37 Int'l J. Toxicology (Supp. 3) 51S–79S (2018), https://doi.org/10.1177/1091581818801814 (concluding that the assessed ingredients are safe in cosmetics in the described practices of use and concentrations "when formulated to be nonsensitizing"; reporting that chamomile imported from Argentina may contain larger amounts of strongly allergenic anthecotulide and may be contaminated with morphologically similar dog fennel, while European-origin chamomile reportedly contains only traces); Paulsen E., *Contact Sensitization from Compositae-Containing Herbal Remedies and Cosmetics*, 47 Contact Dermatitis 189, 189–98 (2002), PMID 12492516; Avonto C., Rua D., Lasonkar P.B., Chittiboyina A.G. & Khan I.A., *Identification of a Compound Isolated from German Chamomile (Matricaria chamomilla) with Dermal Sensitization Potential*, 318 Toxicology & Applied Pharmacology 16, 16–22 (2017), PMID 28109818, DOI 10.1016/j.taap.2017.01.009 (isolating three candidate sensitizers from tested German-chamomile fractions; finding tonghaosu non- to weakly reactive when fresh but more reactive after aging; and finding that its strongly reactive spirolactone

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    17

experimental work isolated three candidate sensitizers from tested German-chamomile fractions and found that aged tonghaosu generated a strongly reactive degradation product that was confirmed as a potential skin sensitizer in a local lymph node assay.[34] Upon information and belief, Defendant's Products use this type of chamomile extract, as evidenced by its industry prevalence.

29.    These two bodies of evidence—chamomile's industry classification as a fragrance ingredient and its clinical identification as a Compositae sensitizer—are mutually reinforcing, not alternative theories of liability. Chamomile flower extract is simultaneously classified as a fragrance by the CIR and COSMILE Europe and documented as an allergen in the fragrance-sensitive population. The consumers most harmed by Defendant's "Hypoallergenic" and "Fragrance Free" representations are precisely those who are both fragrance-allergic and chamomile-sensitized, or who are at elevated risk of developing both sensitivities through the documented pattern of co-reactivity between Compositae allergens and botanical fragrance-related compounds. A "Hypoallergenic" or "Fragrance Free" label on a product containing an ingredient classified as a fragrance by industry

degradation product was a potential skin sensitizer in the murine local lymph node assay). Neither the CIR discussion nor the Avonto study tested any Gold Bond Product or Defendant's chamomile extract, and neither establishes that the extract used in any Product contains anthecotulide, tonghaosu, or the tonghaosu degradation product. One Avonto coauthor was affiliated with FDA's Center for Food Safety and Applied Nutrition, and FDA identifies the paper among its collaborative cosmetics-allergen research, but the article is not an FDA agency determination or conclusion.

[34] Johnson W., Jr., Boyer I., Bergfeld W.F., et al., *Amended Safety Assessment of Chamomilla recutita-Derived Ingredients as Used in Cosmetics*, 37 Int'l J. Toxicology (Supp. 3) 51S–79S (2018), https://doi.org/10.1177/1091581818801814 (concluding that the assessed ingredients are safe in cosmetics in the described practices of use and concentrations "when formulated to be nonsensitizing"; reporting that chamomile imported from Argentina may contain larger amounts of strongly allergenic anthecotulide and may be contaminated with morphologically similar dog fennel, while European-origin chamomile reportedly contains only traces); Paulsen E., *Contact Sensitization from Compositae-Containing Herbal Remedies and Cosmetics*, 47 Contact Dermatitis 189, 189–98 (2002), PMID 12492516; Avonto C., Rua D., Lasonkar P.B., Chittiboyina A.G. & Khan I.A., *Identification of a Compound Isolated from German Chamomile (Matricaria chamomilla) with Dermal Sensitization Potential*, 318 Toxicology & Applied Pharmacology 16, 16–22 (2017), PMID 28109818, DOI 10.1016/j.taap.2017.01.009 (isolating three candidate sensitizers from tested German-chamomile fractions; finding tonghaosu non- to weakly reactive when fresh but more reactive after aging; and finding that its strongly reactive spirolactone degradation product was a potential skin sensitizer in the murine local lymph node assay). Neither the CIR discussion nor the Avonto study tested any Gold Bond Product or Defendant's chamomile extract, and neither establishes that the extract used in any Product contains anthecotulide, tonghaosu, or the tonghaosu degradation product. One Avonto coauthor was affiliated with FDA's Center for Food Safety and Applied Nutrition, and FDA identifies the paper among its collaborative cosmetics-allergen research, but the article is not an FDA agency determination or conclusion.

classification sources, and that sensitizes the same population who relies on such labeling, is materially misleading to the reasonable consumer in that target class even when the ingredient is declared under its botanical INCI name rather than under the generic term "Fragrance."[35]

### iii. α-Bisabolol Is a Fragrance Constituent of Chamomile and a Documented Contact Allergen

30.     Several of the Products separately declare bisabolol as its own ingredient, in addition to or in place of chamomile flower extract. α-Bisabolol is a sesquiterpene alcohol and is the principal aromatic constituent of German chamomile's volatile oil—the same compound that gives chamomile flower extract the "herbal type odor" that industry fragrance databases describe.[36] Its separate declaration on an ingredient list therefore introduces the constituent responsible for chamomile's scent.

31.     Bisabolol is a documented cause of allergic contact dermatitis from cosmetic products. The peer-reviewed literature reports allergic contact dermatitis to bisabolol in cosmetics, including a case of "[s]evere allergic contact dermatitis to bisabolol … found in a moisturizing and strengthening facial cream"—the same product category at issue here.[37]

32.     Regardless of the purpose for which Defendant incorporates bisabolol, its documented aromatic function and allergenicity remain relevant to Products marketed through the Delicate Formulation and Fragrance Free Representations.

### iv. Limonene and Linalool Are Contact Allergens Identified on FDA's Own List, and Their Sensitizing Potency Increases on the Shelf

---

[35] See FDA, *Allergens in Cosmetics*, https://www.fda.gov/cosmetics/cosmetic-ingredients/allergens-cosmetics (FDA has not defined "fragrance free" by regulation). See also CIR, *Amended Safety Assessment*, supra note 22, at 51S (chamomile-derived ingredients classified as fragrance ingredients in commercial use); COSMILE Europe, supra note 20 (chamomile flower extract classified as "Fragrance" under EU INCI nomenclature).

[36] The Good Scents Company, supra note 20; Srivastava J.K., et al., supra note 19 (bisabolol and its oxides are among the principal aromatic volatile constituents of the chamomile flower).

[37] *Severe allergic contact dermatitis to bisabolol*, Contact Dermatitis (2024), PMID 38690643 ("Severe allergic contact dermatitis to bisabolol … found in a moisturizing and strengthening facial cream").

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    19

33.     The FDA maintains a public list of ingredients that are common causes of allergic reactions in cosmetics. That list expressly names d-Limonene and Linalool.[38] Several of the Products contain botanical materials that carry these constituents, including citrus oils and extracts, lavender extract, rosemary extract, and ginger root extract.

34.     The dermatological literature establishes that limonene and linalool become potent contact allergens through autoxidation—that is, through exposure to air over time. The parent terpenes are weak or non-sensitizing in their fresh state; it is their oxidation products, chiefly hydroperoxides, that sensitize.[39] This mechanism matters because it operates on the shelf and in the consumer's home, after manufacture. A study of linalyl acetate—a principal constituent of lavender oil—found that in the murine local lymph node assay the pure compound "showed a weak sensitizing potency (EC3 25%)," while "[a]utoxidation increased the sensitizing potency of linalyl acetate, and a 10 weeks oxidized sample gave an EC3 value of 3.6%"—an approximately sevenfold increase in sensitizing potency after ten weeks of air exposure.[40]

35.     These are not theoretical allergens. In a series of patients whose allergic contact dermatitis was traced to labeled consumer products, "[l]imonene was the most frequent PC confirmed fragrance allergen."[41] And limonene is nearly ubiquitous in botanical materials: a comprehensive review of essential oils reports limonene present in 97% of the oils surveyed.[42]

---

[38] FDA, *Allergens in Cosmetics*, https://www.fda.gov/cosmetics/cosmetic-ingredients/allergens-cosmetics (FDA's enumeration of ingredients that are common causes of allergic reactions in cosmetics includes, among the fragrance category, "d-Limonene" and "Linalool").

[39] Matura M., et al., *Selected oxidized fragrance terpenes are common contact allergens*, Contact Dermatitis (2005) (the parent terpenes are not themselves significant allergens; sensitization results from their air-oxidation products, principally hydroperoxides).

[40] Sköld M., Hagvall L. & Karlberg A.-T., *Autoxidation of linalyl acetate, the main component of lavender oil, creates potent contact allergens*, 58 Contact Dermatitis 9, 9–14 (2008), PMID 18154552, DOI 10.1111/j.1600-0536.2007.01262.x ("In the LLNA, linalyl acetate of high purity showed a weak sensitizing potency (EC3 25%). Autoxidation increased the sensitizing potency of linalyl acetate, and a 10 weeks oxidized sample gave an EC3 value of 3.6%. As for linalool, the hydroperoxides were shown to be the oxidation products with the highest sensitizing potency."). The EC3 values reported are derived from the murine local lymph node assay.

[41] Nardelli A., et al., *Contact allergy to fragrances and parabens in an atopic population*, Contact Dermatitis (2011), PMID 21392029 ("Limonene was the most frequent PC confirmed fragrance allergen").

[42] de Groot A.C. & Schmidt E., *Essential Oils, Part III: Chemical Composition*, 27 Dermatitis 161 (2016), PMID 27427817 (reporting limonene present in 97% of the essential oils surveyed, and

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    20

### *v. Lavandula Angustifolia (Lavender) Extract Is a Fragrance Material and a Recognized Contact Allergen*

36.    Certain of the Products contain *Lavandula Angustifolia* (Lavender) Extract. The clinical and chemical literature described below documents both allergic contact dermatitis attributed to lavender and the formation of potent contact allergens as lavender oil and its terpene constituents oxidize through exposure to air.

37.    Lavender is among the most frequently implicated essential oils in clinically diagnosed allergic contact dermatitis. In a multicentre study of forty-two patients with allergic contact dermatitis attributed to essential oils in consumer products—eight of whom required hospitalization—"[a]ll patients were sensitized to the EO they used, primarily lavender," and 71% also had positive patch tests to fragrance mix I or II.[43]

38.    Lavender oil is chemically unstable in air, and that instability is what generates its allergens. A peer-reviewed study titled "Lavender oil lacks natural protection against autoxidation, forming strong contact allergens on air exposure" found that "[t]he terpenes oxidized in air-exposed lavender oil at the same rates as the pure compounds exposed to air, and the same oxidation products were identified," and that "[t]he sensitizing potency of lavender oil increased accordingly on air exposure."[44]

---

identifying lavender and rosemary among the most chemically complex, with approximately 450–500 constituents).

[43] Barbaud A., Kurihara F., Raison-Peyron N., et al., *Allergic contact dermatitis from essential oil in consumer products: Mode of uses and value of patch tests with an essential oil series*, 89 Contact Dermatitis 190, 190–197 (2023), PMID 37403438, DOI 10.1111/cod.14377 ("The study included 42 patients … with allergic contact dermatitis (ACD), 8 patients required hospitalization. All patients were sensitized to the EO they used, primarily lavender (Lavandula augustifolia, 8000-28-0) … 71% had positive patch tests to fragrance mix I or II"; and "40% of patients did not spontaneously mention the use of EOs").

[44] Hagvall L., Sköld M., Bråred-Christensson J., Börje A. & Karlberg A.-T., *Lavender oil lacks natural protection against autoxidation, forming strong contact allergens on air exposure*, 59 Contact Dermatitis 143, 143–150 (2008), PMID 18759894, DOI 10.1111/j.1600-0536.2008.01402.x ("The terpenes oxidized in air-exposed lavender oil at the same rates as the pure compounds exposed to air, and the same oxidation products were identified. The sensitizing potency of lavender oil increased accordingly on air exposure."; "This study shows that lavender oil lacks natural protection against autoxidation, and that air-exposed lavender oil can be an important source of exposure to allergenic hydroperoxides.").

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                        21

39.    Standard diagnostic panels do not capture all lavender-related allergy. In a consecutive patch-test study, "[p]ositive reactions to oxidized lavender oil were found in 2.8% of the patients," and of those, only 52% "reacted to the fragrance markers of the baseline series"—meaning nearly half of patients allergic to oxidized lavender oil would be missed by routine fragrance screening. The authors reported that "[o]xidized lavender oil showed among the highest frequencies of contact allergy to studied essential oils."[45] The same underdetection phenomenon is documented for botanical allergy generally: in the 15,980-patient series discussed above, "some did not react to the commercial allergens but only to the products used."[46]

### vi. Rosmarinus Officinalis (Rosemary) Leaf Extract Is an Aromatic Botanical That Causes Allergic Contact Dermatitis and Cross-Reacts Within Its Plant Family

40.    Certain of the Products contain Rosmarinus Officinalis (Rosemary) Leaf Extract. Rosemary is a documented cause of allergic contact dermatitis from cosmetic products, and the peer-reviewed literature reports cross-reactivity among related species: in a clinical report of rosemary-induced allergic contact dermatitis from cosmetics, the patient demonstrated "cross-reactivity with 3 of 4 species tested from the same family."[47]

41.    Rosemary belongs to the Lamiaceae family, as does lavender. Products that contain both rosemary and lavender extracts therefore contain two aromatic botanicals from the same plant family for which intra-family cross-reactivity is documented. A comprehensive review of essential oils identifies lavender and rosemary among the most chemically complex, comprising on the order of 450 to 500 individual constituents each.[48]

---

[45] Hagvall L. & Bråred Christensson J., *Patch Testing with Main Sensitizers Does Not Detect All Cases of Contact Allergy to Oxidized Lavender Oil*, 96 Acta Derm. Venereol. 679, 679–683 (2016), PMID 26671837, DOI 10.2340/00015555-2319 ("Positive reactions to oxidized lavender oil were found in 2.8% of the patients. Among those, 56% reacted to oxidized linalool and/or oxidized linalyl acetate, while 52% reacted to the fragrance markers of the baseline series. Oxidized lavender oil showed among the highest frequencies of contact allergy to studied essential oils.").

[46] Gilissen L., Huygens S. & Goossens A., supra note 27.

[47] González-Mahave I., et al., *Rosemary contact dermatitis and cross-reactivity with other Labiate plants*, Contact Dermatitis (2006), PMID 16650096 (documenting allergic contact dermatitis to rosemary from cosmetic use, with "cross-reactivity with 3 of 4 species tested from the same family").

[48] de Groot A.C. & Schmidt E., supra note 39.

### *vii. Acacia Farnesiana Flower Extract Is a Perfumery Material*

42.     Certain of the Products contain Acacia Farnesiana Flower Extract. Acacia farnesiana is a classical perfumery raw material, known in the fragrance trade as cassie. The chemistry literature identifies the C11 compounds of cassie oil as those that "play a prominent role in the characteristic fragrance of cassie oil,"[49] and the perfumery literature treats cassie (acacia) as a fragrance material in its own right.[50] An ingredient whose established commercial function is perfumery is not an olfactorily inert additive.

### *viii. Zingiber Officinale (Ginger) Root Extract Is a Fragrance Material That Carries Recognized Fragrance Allergens*

43.     Several of the Products contain Zingiber Officinale (Ginger) Root Extract, including Products that Defendant represents to be "Fragrance Free" and "Unscented." Ginger is a fragrance material. Ginger oil, obtained from the rhizome of Zingiber officinale, "is used in the beverage and fragrance industries,"[51] and the compositional literature identifies zingiberene as "the fragrance ingredient for the characteristic scent of ginger."[52]

44.     Ginger's aromatic fraction consists substantially of the same terpene constituents that FDA identifies as common cosmetic allergens. Compositional analyses of Zingiber officinale report linalool, geraniol, geranial and neral—the latter two collectively known as citral—and limonene

---

[49] Demole E., *A chemical study of Burley tobacco flavour*, and related work on the C11 constituents of cassie oil (1969) (identifying the C11 compounds that "play a prominent role in the characteristic fragrance of cassie oil").

[50] Anonis D.P., *Cassie (acacia) in perfumery*, Perfumer & Flavorist (1987); see also Cosmetic Ingredient Review, *Safety Assessment of Acacia-Derived Ingredients as Used in Cosmetics* (2006).

[51] Wohlmuth H., Smith M.K., Brooks L., Myers S. & Leach D., *Essential oil composition of diploid and tetraploid clones of ginger (Zingiber officinale Roscoe) grown in Australia*, 54 J. Agric. Food Chem. (2006), PMID 16478268, DOI 10.1021/JF0521799 ("Ginger oil, obtained by steam distillation of the rhizome of Zingiber officinale Roscoe, is used in the beverage and fragrance industries."; Australian ginger oil "has a reputation for possessing a particular 'lemony' aroma, due to its high content of the isomers neral and geranial, often collectively referred to as citral," with citral levels of 51–71% across sixteen of seventeen clones tested).

[52] Thao C.B., Tran T.T., Tran T. & Mai H.C., *Extraction and Volatile Compounds in Ginger Essential Oil (Zingiber officinale Roscoe) at Laboratory Scale*, Asian J. Chemistry (2023), DOI 10.14233/ajchem.2023.30280 (ginger essential oil "comprises the primary chemical constituents such as zingiberene (18.95 %) which is the fragrance ingredient for the characteristic scent of ginger and some other ingredients camphene, b-phellandrene, a-citral, eucalyptol, sesquiphellandrene, a-farnesene, a-pinene").

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    23

among its principal constituents, with citral levels reaching 51% to 71% in some cultivars and geraniol reported at 14.5%.[53] Ginger root extract therefore introduces limonene and linalool—both named on FDA's list of common cosmetic allergens—into Products represented as fragrance free and hypoallergenic.

### ix. Formaldehyde-Releasing Preservatives Are Recognized Contact Allergens Identified on FDA's Own List

45.    Several of the Products contain diazolidinyl urea, DMDM hydantoin, or imidazolidinyl urea. Each is a formaldehyde-releasing preservative—a compound that functions by decomposing to release formaldehyde into the product over time. FDA's list of ingredients that are common causes of allergic reactions in cosmetics expressly enumerates "Formaldehyde and formaldehyde releasing ingredients," and names diazolidinyl urea, DMDM hydantoin, and imidazolidinyl urea among them.[54] The peer-reviewed literature identifies these compounds as "2 well-known contact allergens" and urea and imidazolidinyl urea are inferred to consist substantially of "polymers of allantoin-formaldehyde condensation products."[55]

46.    Formaldehyde was named the American Contact Dermatitis Society's Contact Allergen of the Year for 2015.[56] In the North American Contact Dermatitis Group's published series,

---

[53] Gupta S., Pandotra P., Ram G., et al., *Composition of a Monoterpenoid-rich Essential Oil from the Rhizome of Zingiber officinale from North Western Himalayas*, 6 Nat. Prod. Commun. (2011), PMID 21366054 (oil "characterized by relatively large amounts of the monoterpenoids 1,8-cineole (10.9%), linalool (4.8%), borneol (5.6%), α-terpineol (3.6%), neral (8.1%), geraniol (14.5%), geranial (9.5%)"); Chagonda L. & Chalchat J., *Essential oil Composition of Zingiber officinale Roscoe from Eastern Zimbabwe*, 19 J. Essential Oil Bearing Plants (2016) (oil dominated by "geranial (16.5-17.8%) … limonene (4.7-6.6%) … zingiberene (3.0-9.9%)"); Wohlmuth H., et al., supra note 48. Terpene content in ginger varies with cultivar, geographic origin, plant part, and processing method; the allegation here is that ginger root is a fragrance material containing these constituents, not that any particular concentration is present in the Products.

[54] FDA, *Allergens in Cosmetics*, https://www.fda.gov/cosmetics/cosmetic-ingredients/allergens-cosmetics (the preservative category of FDA's common-allergen enumeration expressly includes "Formaldehyde and formaldehyde releasing ingredients," and lists "Diazolidinyl urea," "DMDM hydantoin (1,3-dimethylol-5,5-dimethylhydantoin)," and "Imidazolidinyl urea" among them).

[55] Lehmann S.V., Hoeck U., Breinholdt J., Olsen C.E. & Kreilgaard B., *Characterization and chemistry of imidazolidinyl urea and diazolidinyl urea*, 54 Contact Dermatitis 50 (2006), PMID 16426294, DOI 10.1111/j.0105-1873.2006.00735.x ("This publication gives an insight into what these 2 well-known contact allergens consist of and their degradation patterns"; "The remaining part of both IU and DU are believed to be polymers of allantoin-formaldehyde condensation products.").

[56] American Contact Dermatitis Society, *Allergen of the Year 2015: Formaldehyde*; see also Pontén A. & Bruze M., *Formaldehyde*, 26 Dermatitis 3 (2015), PMID 25581665.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    24

diazolidinyl urea produced positive patch-test reactions in 2.1% of patients tested, imidazolidinyl urea in 1.6%, and DMDM hydantoin in 1.6%;[57] an earlier NACDG series of 4,454 patients placed diazolidinyl urea among the fifteen most frequently positive allergens in North America, at 3.7%.[58]

47.    The clinical literature treats these preservatives as warranting independent diagnostic attention. A 2022 clinical review identifies "the five main releasers"—"quaternium-15, diazolidinyl urea, DMDM hydantoin, imidazolidinyl urea, and 2-bromo-2-nitropropane-1,3-diol (bronopol)"— observes that "[t]hese ubiquitous preservatives are still often present, and sometimes undeclared, in cosmetics," notes that they "may also complicate atopic and stasis dermatitis," and recommends that "diazolidinyl urea 2% pet. should be patch tested separately in a baseline series."[59] A separate study of formaldehyde-releaser sensitization concluded that atopic patients "should avoid the use of skin care products preserved with formaldehyde releasers."[60]

---

[57] Warshaw E.M., et al., *Patch test results of the North American Contact Dermatitis Group 2011-2012*, 26 Dermatitis 49 (2015), PMID 25581671 (n = 4,238) ("formaldehyde 6.6%; RR, 0.82 [0.73, 0.93]; quaternium-15 6.4% RR 0.75 [0.66, 0.85]; diazolidinyl urea 2.1%; RR, 0.67 [0.54, 0.84]; imidazolidinyl urea 1.6%, 0.60 [0.47, 0.77]; bronopol 1.6%; RR, 0.60 [0.46, 0.77]; DMDM hydantoin 1.6%; RR, 0.59 [0.54, 0.84]"). The same study reports that positivity rates for formaldehyde-releasing preservatives decreased relative to the prior decade.

[58] Zug K.A., et al., *Patch-test results of the North American Contact Dermatitis Group 2005-2006*, 20 Dermatitis 149 (2009), PMID 19470301 (n = 4,454; diazolidinyl urea among the fifteen most frequently positive allergens in North America, at 3.7%).

[59] Goossens A., et al., *Contact allergy to and allergic contact dermatitis from formaldehyde and formaldehyde releasers: A clinical review and update*, 87 Contact Dermatitis 20 (2022), PMID 35229319, DOI 10.1111/cod.14089 ("the role of formaldehyde (FA) and its five main releasers (FRs) quaternium-15, diazolidinyl urea, DMDM hydantoin, imidazolidinyl urea, and 2-bromo-2-nitropropane-1,3-diol (bronopol) … These ubiquitous preservatives are still often present, and sometimes undeclared, in cosmetics, pharmaceuticals, medical devices, household detergents, and chemical (industrial) products … FA/FRs still readily provoke localized (eg, facial/hand), airborne, and generalized dermatitis, and may also complicate atopic and stasis dermatitis, or result in nummular dermatitis … particularly the FRs bronopol 0.5% pet. and diazolidinyl urea 2% pet. should be patch tested separately in a baseline series."). The authors note that European sensitization rates have been stable to decreasing.

[60] Shaughnessy C.N., Malajian D. & Belsito D.V., *Cutaneous delayed-type hypersensitivity in patients with atopic dermatitis*, 70 J. Am. Acad. Dermatol. 102 (2014), PMID 24220722 (concluding that atopic patients "should avoid the use of skin care products preserved with formaldehyde releasers"). The same study found atopic dermatitis associated with hypersensitivity to quaternium-15, imidazolidinyl urea, DMDM hydantoin and bronopol, "but not to parabens, formaldehyde, or diazolidinyl urea"; Plaintiff does not allege that atopic consumers are specifically sensitized to diazolidinyl urea, and relies on the class-level avoidance recommendation the study endorses.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                              25

### x. Methylparaben and Propylparaben Are Recognized Contact Allergens

48.     Several of the Products contain methylparaben, propylparaben, or both. Paraben mix is included in patch-test series used in clinical practice to diagnose allergic contact dermatitis. In the North American Contact Dermatitis Group's published series, paraben mix produced positive reactions in 1.4% of patients tested.[61] Parabens are less frequent allergens than fragrance or the formaldehyde releasers, and Plaintiff does not allege otherwise; a large meta-analysis places paraben mix at 0.5%.[62] But an ingredient included in clinical patch testing and documented to produce positive patch-test reactions is a recognized contact allergen, and its presence is inconsistent with an unqualified representation that a Product is "Hypoallergenic."

49.     A6 and A10 compound this problem. Each listing represents that Product as containing "no parabens" while declaring methylparaben in the same listing's ingredient list. Those representations are independently false on the face of the respective listings and require no expert evidence to evaluate.[63]

### xi. Propylene Glycol Is the American Contact Dermatitis Society's Allergen of the Year and Both a Sensitizer and an Irritant

50.     The overwhelming majority of the Products contain propylene glycol. Propylene glycol was named the American Contact Dermatitis Society's Contact Allergen of the Year for 2018, and the dermatological literature describes it as "as contentious as it is ubiquitous because it acts as

---

[61] Warshaw E.M., et al., supra note 54 (paraben mix 1.4%).

[62] Krob H.A., et al., *Prevalence and relevance of contact dermatitis allergens: a meta-analysis of 15 years of published T.R.U.E. test data*, 51 J. Am. Acad. Dermatol. 349 (2004), PMID 15337975 (paraben mix 0.5%, among the five least prevalent allergens in the pooled data).

[63] Two no-parabens representations are also independently false on their face. Exhibit A-6 represents that the Product "Contains no parabens" and displays "NO PARABENS, PHTHALATES, DYES," while the same listing's ingredient declaration includes methylparaben. Exhibit A-10 likewise displays "NO PARABENS, PHTHALATES, DYES," while the same listing's ingredient declaration includes methylparaben. Plaintiff pleads these contradictions as additional support for the Delicate Formulation Representations, not as a separate representation theory.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    26

both a weak sensitizer and an irritant."[64] The systematic review accompanying that designation documents "[c]ontact, systemic, and irritant cutaneous reactions" to propylene glycol.[65]

51.    Detection of propylene glycol allergy is concentration-dependent, which means published prevalence figures understate it. In a retrospective analysis of 1,979 patients patch tested at a university hospital, 2.79% were allergic to propylene glycol, and "[d]etection rates for PG increased with concentration: 5% petrolatum (1.06%), 10% aqueous (0%), 20% aqueous (0.66%), 30% aqueous (2.19%) and 100% (7.82%, selectively tested)."[66] The authors concluded that thirty percent aqueous propylene glycol "appears more suitable for screening than lower concentrations."

52.    Propylene glycol is additionally identified in the dermatological literature as one of the cosmetic ingredients implicated in sensitive-skin hyperreactivity—a condition in which "substances that are not commonly considered irritants" produce itching, burning, stinging and a tight sensation. The literature names "salicylic acid, propylene glycol" among the cosmetic ingredients involved in that response.[67] Propylene glycol is therefore inconsistent not only with a representation that a product is "Hypoallergenic," but with a representation that it is "non-irritating."

---

[64] Jacob S.E., Scheman A. & McGowan M.A., *Propylene Glycol*, 29 Dermatitis 3 (2018), PMID 29059092, DOI 10.1097/DER.0000000000000315 ("Propylene glycol (PG), an emollient and emulsifier found in cosmetics, medications, and food, has been granted the dubious honor of being named the American Contact Dermatitis Society's Allergen of the Year for 2018"; "Propylene glycol is as contentious as it is ubiquitous because it acts as both a weak sensitizer and an irritant, confounding the results of positive patch tests.").

[65] McGowan M.A., Scheman A. & Jacob S.E., *Propylene Glycol in Contact Dermatitis: A Systematic Review*, 29 Dermatitis 6 (2018), PMID 29064881, DOI 10.1097/DER.0000000000000307 ("Contact, systemic, and irritant cutaneous reactions have been documented for PG, which has become an increasingly common ingredient.").

[66] Kanokrungsee S., Dendooven E. & Aerts O., *Contact Allergy and Allergic Contact Dermatitis From Propylene Glycol and Related Glycols: Cosmetic Skin Sensitisers After All?*, Contact Dermatitis (2026), PMID 42380076, DOI 10.1111/cod.70211 ("Fifty-five patients (2.79%) were allergic to PG. Detection rates for PG increased with concentration: 5% petrolatum (1.06%), 10% aqueous (0%), 20% aqueous (0.66%), 30% aqueous (2.19%) and 100% (7.82%, selectively tested)."; "Thirty percent aqueous PG appears more suitable for screening than lower concentrations"; "Cosmetics (67.3%) were the most common exposure source").

[67] Primavera G. & Berardesca E., *Sensitive skin: mechanisms and diagnosis*, 27 Int'l J. Cosmetic Sci. 1 (2005), PMID 18492176, DOI 10.1111/j.1467-2494.2004.00243.x ("Generally substances that are not commonly considered irritants are involved in this abnormal response. They include many ingredients of cosmetics such as: dimethyl sulfoxide, benzoyl peroxide preparations, salicylic acid, propylene glycol, amyldimethylaminobenzoic acid and 2-ethoxyethyl methoxycinnamate."; "[a]lthough no sign of irritation is commonly detected, itching, burning, stinging and a tight sensation are constantly present").

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                27

### xii. Caprylyl Glycol Is an Emerging Contact Allergen That Routine Screening Does Not Detect

53.    Certain of the Products contain caprylyl glycol. The contact-dermatitis literature identifies caprylyl glycol as a clinically relevant emerging sensitizer that standard patch-test screening fails to detect: a 2025 report in *Contact Dermatitis* is titled "Caprylyl Glycol, a Trending and Highly Relevant Sensitiser in Cosmetics That Needs to be Patch Tested Separately."[68] The same research group's retrospective analysis identified caprylyl glycol allergy in patients tested with the ingredient, and documented concomitant reactions to propylene glycol among caprylyl-glycol-allergic patients, noting that cross-reactivity "is most evident among structurally similar short-chain glycols."[69] Caprylyl glycol has separately been reported as a cause of contact urticaria following use of a cosmetic product containing it.[70]

### xiii. Phenoxyethanol Is a Documented Contact Allergen and Contact Urticant

54.    Certain of the Products contain phenoxyethanol. Although phenoxyethanol is an uncommon sensitizer relative to fragrance or the formaldehyde releasers—and Plaintiff does not allege otherwise[71]—it is a documented cause of allergic contact dermatitis, including from over-the-counter hand creams. In a 2021 report in *Contact Dermatitis*, a patient with year-long therapy-resistant hand dermatitis showed "a 2+ reaction to PE 1% pet." sustained from day 2 through day 7;

---

[68] Kanokrungsee S., Dendooven E. & Aerts O., *Caprylyl Glycol, a Trending and Highly Relevant Sensitiser in Cosmetics That Needs to be Patch Tested Separately*, 93 Contact Dermatitis 418, 418–421 (2025), PMID 40855841, DOI 10.1111/cod.70019 (case report; indexed keywords include "1,2-Octanediol," "CAS no. 1117-86-8," "alkyl glycol," "allergic contact dermatitis," "caprylyl glycol," "cosmetics," "cross-reaction," "preservative," and "propylene glycol").

[69] Kanokrungsee S., Dendooven E. & Aerts O., supra note 62 ("Pentylene glycol allergy was found in 6.74% (6/89) and caprylyl glycol in 0.77% (5% petrolatum) and 0.12% (1% petrolatum). Concomitant reactions to PG occurred in 4/6 pentylene glycol-allergic and 2/9 caprylyl glycol-allergic patients."; "Cross-reactivity seems limited and is most evident among structurally similar short-chain glycols.").

[70] Coelho E.Q., Wu S.L.C., Nunes R.S. & Reis V.M.S., *Contact urticaria following the use of a cosmetic containing caprylyl glycol: A case report*, Contact Dermatitis (2019), PMID 31026059, DOI 10.1111/cod.13299. Contact urticaria is an immediate-type reaction and is mechanistically distinct from allergic contact dermatitis.

[71] See Hausen B.M., *The sensitizing potency of Euxyl® K 400 and its components 1,2-dibromo-2,4-dicyanobutane and 2-phenoxyethanol*, 28 Contact Dermatitis 149 (1993), PMID 8462291 (in guinea-pig sensitization testing, "Phenoxyethanol remained almost negative"; noting that "[c]ases of phenoxyethanol contact allergy have been published hitherto only 4× in the medical literature").

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    28

a repeated open application test with a phenoxyethanol-containing hand cream "resulted in a positive reaction"; and the patient's "[d]ermatitis of hands and lower arms improved significantly after avoidance of these skin care products, indicating clinical relevance of the sensitization to PE."[72] Phenoxyethanol is also a documented cause of immediate contact urticaria.[73]

### *xiv. Salicylic Acid, Lactic Acid, and Urea Are Skin Irritants*

55.    Several of the Products contain salicylic acid, lactic acid, or urea. The dermatological and CIR literature identifies these ingredients as capable of provoking hyperreactivity, stinging, irritation, or burning under the conditions described below.

56.    Salicylic acid is named in the sensitive-skin literature among the cosmetic ingredients implicated in cutaneous hyperreactivity.[74] Lactic acid is the reference agent used in dermatology to provoke stinging for the purpose of *identifying* sensitive skin: the lactic acid sting test is a standard method in sensitive-skin assessment, and in a controlled comparison of patients with self-reported sensitive skin against matched controls, "the subjective findings of stinging test produced significant results (p < 0.001)."[75] An ingredient used clinically because it reliably provokes stinging in sensitive

---

[72] Kolodziej M., Kiewert A., Skudlik C. & Brans R., *Allergic contact dermatitis to phenoxyethanol: A rare, but possible cause of hand dermatitis*, 86 Contact Dermatitis 227 (2021), PMID 34921565, DOI 10.1111/cod.14029 ("Solely, a 2+ reaction to PE 1% pet. … from D2 to D7 was noted"; "Repeated open application test (ROAT) with 'Eucerin UreaRepair PLUS 5% Hand Creme,' two times daily for 6 days on the inner sides of the patient's upper arm resulted in a positive reaction"; "Dermatitis of hands and lower arms improved significantly after avoidance of these skin care products, indicating clinical relevance of the sensitization to PE").

[73] Hernandez B., Ortiz-Frutos F.J., García M., Palencia S., García M. & Iglesias L., *Contact urticaria from 2-phenoxyethanol*, 47 Contact Dermatitis 54 (2002), PMID 12225420, DOI 10.1034/J.1600-0536.2002.470116.X; see also Aranzabal M.A., et al., *Contact urticaria caused by phenoxyethanol in ultrasound gel*, Contact Dermatitis (2019), PMID 30820971, DOI 10.1111/cod.13255; Vogt T., Landthaler M. & Stolz W., *Generalized eczema in an 18-month-old boy due to phenoxyethanol in DPT vaccine*, 38 Contact Dermatitis 50 (1998), PMID 9504254.

[74] Primavera G. & Berardesca E., supra note 63.

[75] Roussaki-Schulze A.V., Zafiriou E., Nikoulis D., Klimi E., Rallis E. & Zintzaras E., *Objective biophysical findings in patients with sensitive skin*, 31 Drugs Exp. Clin. Res. 17 (2005), PMID 16444908 ("The testing methods included in vivo and in vitro tests: epicutaneous testing (Patch tests); measurement of sebum and hydration of the skin; alkali resistance test; stinging test with lactic acid …"; "In addition, the subjective findings of stinging test produced significant results (p < 0.001) as was anticipated."). Stinging response is a measure of sensory irritation and does not predict susceptibility to other classes of cutaneous reaction. See Marriott M., et al., *The complex problem of sensitive skin*, 53 Contact Dermatitis 93 (2005), PMID 16033403.

---

individuals is not consistent with a representation that a product is "non-irritating" or suitable for sensitive skin.

57.    Urea is likewise an irritant at cosmetic use concentrations. The CIR safety assessment of urea reports that "5% Urea was slightly irritating and 20% Urea was irritating," and that "[b]urning sensations are the most frequently reported effect of Urea."[76]

58.    Urea performs a second and independently significant function: it increases the skin's absorption of other ingredients formulated alongside it. The same CIR assessment reports that "[t]he absorption of Urea across normal and abraded human skin was 9.5% +/- 2.3% and 67.9% +/- 5.6%, respectively"—roughly a sevenfold increase through compromised skin—and that "Urea increased the skin penetration of other compounds." The Panel expressly cautioned that "formulators should be aware that Urea can increase the percutaneous absorption of other chemicals."[77] Products that combine urea with fragrance, propylene glycol, and other recognized allergens, and that are marketed for use on dry, cracked, or otherwise compromised skin, therefore deliver those allergens through a barrier that the product's own formulation renders more permeable.

### xv. Quaternary Ammonium Compounds Are Irritants for Which the Industry's Own Panel Has Identified Safety-Data Gaps

59.    The overwhelming majority of the Products contain one or more quaternary ammonium compounds—including distearyldimonium chloride, behentrimonium methosulfate, and stearamidopropyl PG-dimonium chloride phosphate. The CIR Expert Panel's class assessment of these compounds reports that the Panel "reviewed the relevant animal and human data and noted

[76] Andersen F.A., *Final report of the safety assessment of Urea*, 24 Int'l J. Toxicology (Supp. 3) 1 (2005), PMID 16422263 ("Exposure of normal human skin to 60% Urea produced no significant irritation in one study, but 5% Urea was slightly irritating and 20% Urea was irritating in other reports. Burning sensations are the most frequently reported effect of Urea used alone or with other agents in treatment of diseased skin."). The concentration of urea in the Products is not disclosed on their labels.

[77] Andersen F.A., supra note 72 ("The absorption of Urea across normal and abraded human skin was 9.5% +/- 2.3% and 67.9% +/- 5.6%, respectively."; "Urea increased the skin penetration of other compounds, including hydrocortisone."; "Although noting that formulators should be aware that Urea can increase the percutaneous absorption of other chemicals, the CIR Expert Panel concluded that Urea is safe as used in cosmetic products."). The reported penetration-enhancement finding concerns hydrocortisone; Plaintiff alleges that urea is a documented penetration enhancer, not that any specific enhancement factor has been measured for the other ingredients in the Products.

gaps in the available safety data for some of the" ingredients in the class; that it nonetheless extended the available data "to the entire group" on the basis of "similar structural activity relationships, functions in cosmetics, and cosmetic product usage"; and that these ingredients are safe "when formulated to be nonirritating."[78] Quaternary ammonium compounds in this class are documented dermal irritants, with irritancy varying by solubility.[79]

### xvi. Triethanolamine Is the Most Frequent Sensitizer Among Commonly Used Cosmetic Emulsifiers

60.     Certain of the Products contain triethanolamine. In a clinical study of 737 patients with suspected cosmetic- or medicament-related contact dermatitis patch tested against six emulsifying agents, "triethanolamine [was] the most frequent sensitizer" of the six.[80] The same study found that "[p]atients with emulsifier sensitivity generally give a high prevalence of positive patch tests to other common ingredients of topical preparations, such as preservatives or active ingredients," and—significantly for the detection problem described throughout this section—that

---

[78] Becker L.C., Bergfeld W.F., Belsito D.V., Hill R.A., Klaassen C.D., Liebler D., Marks J.G., Shank R.C., Slaga T.J., Snyder P.W. & Andersen F.A., *Safety assessment of trimoniums as used in cosmetics*, 31 Int'l J. Toxicology (Supp. 1) 296S, 296S–341S (2012), PMID 23283705, DOI 10.1177/1091581812467378 ("Quaternary ammonium salts, including alkyl chain, alkanol, and polymer derivatives (trimoniums) are used in cosmetics mainly as surfactant-cleansing agents, hair-conditioning agents, and antistatic agents. The Cosmetic Ingredient Review Expert Panel reviewed the relevant animal and human data and noted gaps in the available safety data for some of the trimomiums. The available data on many of the trimoniums are sufficient, however, and similar structural activity relationships, functions in cosmetics, and cosmetic product usage supported extending these data to the entire group. These ingredients were determined to be safe in the present practices of use and concentration when formulated to be nonirritating.").

[79] Lin G.H. & Hemming M., *Ocular and dermal irritation studies of some quaternary ammonium compounds*, 34 Food Chem. Toxicol. 177, 177–182 (1996), PMID 8606034, DOI 10.1016/0278-6915(95)00099-2 (of four quaternary ammonium compounds tested, two "were also severely or extremely irritating to the skin of the test animals," while two were non-irritating; "[t]he irritancy of these compounds is likely to be related to their solubility, in addition to the cationic characteristics"; "[i]t appears that not all quaternary ammonium compounds in this study are irritants").

[80] Tosti A., Guerra L., Morelli R. & Bardazzi F., *Prevalence and sources of sensitization to emulsifiers: a clinical study*, 23 Contact Dermatitis 68, 68–72 (1990), PMID 2145129, DOI 10.1111/j.1600-0536.1990.tb03225.x ("737 patients with suspected cosmetic- or medicament-related contact dermatitis were patch tested with 6 emulsifier agents: triethanolamine, cetyl stearyl alcohol, sorbitan sesquioleate, polyoxyethylene sorbitan monopalmitate, polyoxyethylene sorbitan monooleate, and Amerchol L 101. 39 patients (5.3%) gave 1 or more positive patch tests to emulsifiers. A total of 54 positive reactions were found, 23 of which were clinically relevant, triethanolamine being the most frequent sensitizer."). Triethanolamine's rank is relative to the six emulsifiers tested in that study.

---

"[p]atch tests with patients' own causative preparations were frequently negative."[81] A separate study of 310 patients found that 16% were sensitized to emulsifiers and concluded that "[c]ontact allergy to emulsifiers is more frequent than reported."[82]

### xvii. Cetearyl Alcohol and Cetyl Alcohol Are Reported Contact Allergens in Leave-On Products

61.     The great majority of the Products contain cetearyl alcohol, cetyl alcohol, or both. Cetearyl alcohol has been identified in the peer-reviewed literature as the most common allergen identified in leave-on personal care products marketed as hypoallergenic,[83] and allergic contact dermatitis from cetyl alcohol is documented in the contact-dermatitis literature.[84] Cetyl alcohol and cetearyl alcohol are chemically distinct ingredients, and both appear on the Products' ingredient declarations.

### xviii. Additional Botanical Extracts Compound the Allergen Burden, and Industry Guidance Warns Against Stacking Them

62.     Beyond chamomile, bisabolol, lavender, rosemary, acacia, and ginger, certain of the Products contain further botanical extracts that carry documented sensitization potential, including Avena sativa (oat) kernel extract, Butyrospermum parkii (shea) butter extract, and Boswellia serrata gum.

---

[81] Tosti A., et al., supra note 76 ("Patients with emulsifier sensitivity generally give a high prevalence of positive patch tests to other common ingredients of topical preparations, such as preservatives or active ingredients."; "Patch tests with patients' own causative preparations were frequently negative.").

[82] Corazza M., Virgili A., Ricci M., Bianchi A. & Borghi A., *Contact Sensitization to Emulsifying Agents: An Underrated Issue?*, 27 Dermatitis 276, 276–281 (2016), PMID 27649350, DOI 10.1097/DER.0000000000000209 ("Of 310 patients, 50 (16%) were sensitized to emulsifiers with 72 positive reactions."; "Contact allergy to emulsifiers is more frequent than reported. Patients allergic to emulsifiers show frequent positive patch tests to other constituents of cosmetics and topical products."). The emulsifiers tested in that study were lauryl polyethylene glycol/polypropylene glycol-18/18 methicone, glyceryl oleate, myristyl alcohol and Amerchol L101.

[83] Hiranput S., et al., *Fragrance and preservative allergens in personal care products marketed as suitable for sensitive skin*, Br. J. Dermatol. (conference proceedings) (identifying cetearyl alcohol as the most common allergen identified in leave-on personal care products marketed as hypoallergenic).

[84] Aakhus A.E. & Warshaw E.M., *Allergic contact dermatitis from cetyl alcohol*, 22 Dermatitis 56, 56–57 (2011), PMID 21291645 (case reports; indexed MeSH terms include "Dermatitis, Allergic Contact," "Fatty Alcohols," and "Patch Tests").

---

63.     Oat is a documented percutaneous sensitizer, particularly in individuals with impaired skin barrier. A study of children with atopic dermatitis found oat sensitization in 32.5% of those tested, with 14.6% showing positive patch tests to oat extracts, and the authors recommended against the use of oat-protein topicals in atopic children.[85] A review in *Dermatitis* concluded that "[i]mpaired barrier functions in atopic dermatitis (AD) may increase the risks of sensitization to oat and wheat proteins via skin," and that "[c]omplete avoidance of oat- or wheat-derived products is suggested as we cannot conclude that some oat- or wheat-derived components such as oils are free of protein."[86] Allergic contact dermatitis to Boswellia serrata extract in a topical cream is likewise reported in the peer-reviewed literature.[87]

64.     The CIR Expert Panel has concluded that shea butter-derived ingredients are safe "when formulated to be non-sensitizing," and has separately cautioned formulators regarding products that combine multiple botanical ingredients.[88] Several of the Products stack four or more distinct botanical extracts in a single formulation while representing the product to be "Hypoallergenic."

---

[85] Boussault P., Léauté-Labrèze C., Saubusse E., Maurice-Tison S., Perromat M., Roul S., Sarrat A., Taïeb A. & Boralevi F., *Oat sensitization in children with atopic dermatitis: prevalence, risks and associated factors*, 62 Allergy 1251 (2007), PMID 17919139, DOI 10.1111/j.1398-9995.2007.01527.x (reporting oat sensitization in children with atopic dermatitis studied, with 4.6% showing positive patch tests to oat extracts and 19.2% positive skin prick tests to oat pollen, and recommending against the use of oat-protein-containing topical products in atopic children).

[86] Pootongkam S. & Nedorost S., *Oat and Wheat as Contact Allergens in Personal Care Products*, 24 Dermatitis 291 (2013), PMID 24201466, DOI 10.1097/DER.0b013e3182a745f8 ("Impaired barrier functions in atopic dermatitis (AD) may increase the risks of sensitization to oat and wheat proteins via skin. Immediate- and delayed-type hypersensitivity reactions to oat and wheat in personal care products have been reported in previous studies, and most of those cases were patients with AD."; "Complete avoidance of oat- or wheat-derived products is suggested as we cannot conclude that some oat- or wheat-derived components such as oils are free of protein.").

[87] Acebo E., et al., *Allergic contact dermatitis from Boswellia serrata extract in a naturopathic cream*, 51 Contact Dermatitis 91 (2004), PMID 15373853.

[88] Cosmetic Ingredient Review, *Safety Assessment of Butyrospermum parkii (Shea)-Derived Ingredients as Used in Cosmetics* (2024) (concluding that the ingredients are safe "when formulated to be non-sensitizing," and cautioning formulators with respect to products containing multiple botanical ingredients).

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                        33

*xix. Ethylhexylglycerin Is a Reported Contact Allergen*

65.     Several of the Products contain ethylhexylglycerin. Allergic contact dermatitis to ethylhexylglycerin is reported in the peer-reviewed contact-dermatitis literature.[89]

**D.     The Products Are Marketed to Consumers Whose Skin Is Least Able to Tolerate These Ingredients**

66.     Defendant markets the Products, including several Products specifically formulated and promoted for compromised skin, to consumers with dry, cracked, itchy, irritated, sensitive, eczema-prone, or diabetic skin. That is the population for whom the ingredients described above present the greatest risk, and it is the population that relies most heavily on representations of hypoallergenicity.

67.     Consumers with compromised skin barriers are more susceptible to irritant reactions. A study measuring transepidermal water loss and irritant response found that "[c]linically dry skin was more susceptible than normal skin," and that increased susceptibility to irritants in subjects with a history of atopic dermatitis was "probably due to impaired barrier function and/or the presence of a dry skin."[90] Adults with type 2 diabetes have measurably impaired epidermal barriers: a controlled study found that "[p]atients with type 2 DM presented with epidermal barrier impairments, including SC hydration," and that in stratum corneum lipid analysis, "ceramides, fatty acids and cholesterol

---

[89] Mortz C.G., Otkjaer A. & Andersen K.E., *Allergic contact dermatitis to ethylhexylglycerin and pentylene glycol*, 61 Contact Dermatitis 180 (2009), PMID 19780779, DOI 10.1111/j.1600-0536.2009.01586.x (case report; indexed MeSH terms include "Cosmetics," "Dermatitis, Allergic Contact," "Glyceryl Ethers," and "Preservatives, Pharmaceutical").

[90] Tupker R.A., Pinnagoda J., Coenraads P.J. & Nater J.P., *Susceptibility to irritants: role of barrier function, skin dryness and history of atopic dermatitis*, 123 Br. J. Dermatol. 199, 199–205 (1990), PMID 2400722, DOI 10.1111/j.1365-2133.1990.tb01847.x ("Clinically dry skin was more susceptible than normal skin, though no difference was noted in the pre-exposure barrier function. The increased susceptibility to irritants in those with a past history of AD was probably due to impaired barrier function and/or the presence of a dry skin.").

---

were significantly decreased in patients with type 2 DM compared with controls."[91] That impairment worsens with the duration of hyperglycemia.[92]

68.    Industry guidance recognizes that compromised skin can change the sensitization analysis. The CIR has stated of one cationic surfactant that it "is not a sensitizer to normal humans at concentrations of 0.1%, but may be to individuals with diseased skin."[93]

69.    Consumers who purchase products labeled "Hypoallergenic," "Fragrance Free," "Unscented," and "non-irritating" do so in order to avoid the ingredients described above. A reasonable consumer would not understand a product represented as hypoallergenic to contain generic fragrance mixtures, multiple fragrance-carrying botanical extracts, formaldehyde-releasing preservatives, parabens, the American Contact Dermatitis Society's Allergen of the Year, and multiple additional ingredients documented as contact allergens or irritants. The representations are false and misleading, and they are material to the reasonable consumer in the population Defendant targets.

---

[91] Kim J.-H., Yoon N.Y., Kim D.H., Jung M., Jun M., Park H.-Y., Chung C.H., Lee K., Kim S., Park C.S., Liu K.-H. & Choi E.H., *Impaired permeability and antimicrobial barriers in type 2 diabetes skin are linked to increased serum levels of advanced glycation end-product*, 27 Exp. Dermatol. 815, 815–823 (2018), PMID 29151267, DOI 10.1111/exd.13466 ("Patients with type 2 DM presented with epidermal barrier impairments, including SC hydration, which was influenced by blood glucose control (HbA1c level). In the lipid analysis of SC, ceramides, fatty acids and cholesterol were significantly decreased in patients with type 2 DM compared with controls.").

[92] Park H.-Y., Kim J.-H., Jung M., Chung C.H., Hasham R., Park C.S. & Choi E.H., *A long-standing hyperglycaemic condition impairs skin barrier by accelerating skin ageing process*, 20 Exp. Dermatol. 969, 969–974 (2011), PMID 22017743, DOI 10.1111/j.1600-0625.2011.01364.x ("A long-standing hyperglycaemic condition impairs skin barrier function including permeability and antimicrobial barriers by accelerating skin ageing process in proportion to the duration of hyperglycaemia, which could be a major pathophysiology underlying cutaneous complications of DM."). This finding derives from an animal model of long-standing hyperglycemia.

[93] Cosmetic Ingredient Review, *Final Report on the Safety Assessment of Benzalkonium Chloride*, 8 J. Am. Coll. Toxicology 589 (1989), DOI 10.3109/10915818909010524 ("It is a skin and ocular irritant at concentrations greater than 0.1%. This cosmetic ingredient is not a sensitizer to normal humans at concentrations of 0.1%, but may be to individuals with diseased skin."). Benzalkonium chloride is not an ingredient in the Products; the CIR's finding is cited for the principle, which the Panel states as to a cationic surfactant class, that sensitization analysis differs for consumers whose skin is not intact.

---

### E.    Defendant's Representations Are False and Misleading

70.    Through the acts and conduct alleged herein, Defendant makes two interrelated groups of representations: the Delicate Formulation Representations and the Fragrance Free Representations. Both Representations are false or materially misleading.

#### *i. The Delicate Formulation Representations*

71.    The term "hypoallergenic" communicates to a reasonable consumer that a product is formulated to reduce the likelihood of allergic reactions. That expectation is reinforced by Defendant's related representations that the Products are dermatologist tested or developed, allergy tested, and suitable for sensitive, irritated, itchy, eczema-prone, or diabetic skin, and are designed to be non-irritating, healing, soothing, comforting, calming, relieving, gentle, skin-loving, and science-backed, and free of parabens. Reasonable consumers understand those statements, individually and collectively, as assurances that Defendant selected and formulated the Products' ingredients to reduce allergic reactions or irritation.

72.    The Products are not formulated consistently with that unqualified message. As detailed above, they contain recognized contact allergens and irritants, including generic fragrance mixtures, fragrance-function botanicals, formaldehyde-releasing preservatives, parabens, propylene glycol, caprylyl glycol, phenoxyethanol, keratolytic acids, urea, quaternary ammonium compounds, triethanolamine, fatty alcohols, and additional botanical allergens. Several of those ingredients appear in standard clinical patch-test series, have been named allergens of the year, or are considered safe by industry sources only when formulated to be nonsensitizing or nonirritating. The no-parabens component of the Delicate Formulation Representations is also independently false in certain listings containing that claim.[94]

#### *ii. The Fragrance Free Representations*

73.    A reasonable consumer understands "Fragrance Free" and "Unscented" to mean that the Products contain no ingredient whose function is to add, modify, or mask scent. Yet three Products explicitly declare "Fragrance" while bearing the Fragrance Free Representations. The other

---

[94] Certain listings represent that it "Contains no parabens" and displays "NO PARABENS, PHTHALATES, DYES," while the same listing's ingredient declaration includes methylparaben.

Fragrance Free Products either contain chamomile flower extract, which industry classification sources identify as a fragrance ingredient, or, separately, aromatic ingredients, including bisabolol, ginger, and citrus oils or extracts. The Fragrance Free Representations are therefore either false or materially misleading.

### iii. The Ingredient Declarations Do Not Cure the Deception

74.     A reasonable consumer is not required to study an ingredient declaration, conduct scientific research, or possess specialized knowledge of contact dermatitis, botanical chemistry, fragrance functions, preservative chemistry, or clinical patch testing to determine whether Defendant's affirmative Representations are true. Ingredient declarations do not disclose the constituents hidden within generic "Fragrance"; do not disclose the geographic source or sensitizing profile of botanical extracts; and do not tell consumers which ingredients function as fragrances, masking agents, allergens, irritants, penetration enhancers, or formaldehyde releasers. The ingredient declarations therefore do not cure the prominent Representations.

F.     **Defendant Knew the Products Did Not Live Up to the Representations**

75.     Defendant knew or should have known that the Products did not live up to the Representations. Dozens of consumers had complained on Walmart, CVS, and Defendant's own Gold Bond website that the Products caused or coincided with rashes, burning, itching, stinging, redness, breakouts, and other irritation. Consumers also complained that the Product had an unexpectedly strong or irritating fragrance. Complaints published on Defendant's own website placed Defendant on direct notice that consumers were attributing recurring irritation and fragrance-related problems to the Product, while similar complaints on major retailer product pages showed that the reports were not isolated.[95]

---

[95] See Walmart, *Gold Bond Healing Hydrating Hand and Body Lotion Cream for Dry Skin with Aloe, Value Size, 24 oz*, https://www.walmart.com/ip/Gold-Bond-Healing-Hydrating-Hand-and-Body-Lotion-Cream-for-Dry-Skin-with-Aloe-Value-Size-24-oz/1042051569?classType=VARIANT&athbdg=L1102&from=/search (last accessed July 30, 2026); CVS, *Gold Bond Healing Hydrating Lotion with Aloe, 24 oz*, https://www.cvs.com/shop/gold-bond-healing-hydrating-lotion-with-aloe-24-oz-prodid-192808 (last accessed July 30, 2026); Gold Bond, *Healing Hydrating Lotion with Aloe*, https://www.goldbond.com/en-us/products/healing-with-aloe (last accessed July 30, 2026).

---

76. The following are illustrative complaints of Defendant's Gold Bond Healing Hydrating Lotion with Aloe alone:

| Source and date | Reviewer and title | Illustrative review excerpt |
|---|---|---|
| GoldBond.com — 1 yr ago | CHAOSITYJ, "Shady Business Practice" | "You changed not only the packaging, but also the ingredients!! The bottle simply said 'New Look'. I have had the worst rash, and have been seeing Dermatologist after Dermatologist with no luck!" |
| GoldBond.com — 2 yrs ago | TORI, "New Formula Is Terrible" | "I've been exclusively using Gold Bond Ultimate Healing lotion for 10 years . . . . This year they changed the formula and it's ineffective and made me break out. . . . [T]he ingredients are different and it is a totally different (much worse) lotion." |
| GoldBond.com — 2 yrs ago | JEN123, "New Formula Is Terrible" | "The new formula . . . is absolutely TERRIBLE!! . . . [It] stings when my hands are already cracking. The smell is strong and unpleasant." |
| GoldBond.com — 3 yrs ago | MARSHLOR, "Horrible Scent" | "This has an overpowering floral scent to it! It does not state this on the bottle at all and makes this a problem for people that are allergic or sensitive to odors." |
| CVS — 1 yr ago | CY123 | "Formula has changed! . . . [T]here is an ingredient (matricaria) on there that I'm allergic to!" |
| CVS — 1 yr ago | joy007 | "Changed Formula . . . wreaking havoc on my skin causing excessive redness, breakouts." |
| CVS — 2 yrs ago | AngH | "New Formula Causing Rash!!! . . . [R]ash is going away [after stopping]." |
| CVS — 3 yrs ago | Coopk | "Very irritating . . . makes me itch." |
| Walmart — Apr. 2, 2022 | Walmart reviewer | "I have just realized that your product is causing a painful burning itching rash. I've tried it several times and each time it's caused skin lesions. Read other reviews about others having this same problem." |
| Walmart — Nov. 30, 2022 | Walmart reviewer | "I just purchased the 'new look' that is fragrance free. . . . It just turned my hands bright red and shiny. I have a warm and itchy sensation all over my hands. It's also causing my hands to break out in little clear water filled bumps." |
| Walmart — Mar. 2, 2023 | Walmart reviewer | "Irritation on face!!! . . . [T]hinking it was caused by another lotion, so I used it again on my face and got an irritation again." |
| Walmart — Apr. 10, 2024 | Walmart reviewer | "[I]t has an ingredient thats irritated my skin to the point that i thought i was cooking a lobster on my leg, wait no that is my leg." |
| Walmart — Feb. 12, 2025 | Walmart reviewer | "I find that it tends to start stinging even on areas that aren't open." |

77. These complaints are consistent with the allegation detailed herein: consumers repeatedly reported irritation, allergic-type reactions, or unexpectedly strong fragrance from a Product marketed as "Hypoallergenic," "Dermatologist-Tested," "Healing," soothing and comforting, and fragrance free or unscented. The volume, content, and recurrence of the complaints gave Defendant actual or constructive notice that consumers were experiencing and attributing those problems to the Product.

78. More concerning still, the FDA's Adverse Event Monitoring System ("AEMS") Public Dashboard for Cosmetic Products likewise contains multiple expedited reports in which several Products were identified as causing adverse reactions. The reported adverse-event terms included rash, pruritus, hypersensitivity, burns, swelling, skin irritation, pain, and skin reactions. Illustrative reports include:[96]

| AER No. | FDA received | Suspect reported product | Reported adverse-event terms |
|---|---|---|---|
| 25769205 | Sept. 5, 2025 | Gold Bond Age Renew Crepe Corrector | Rash; skin reaction |
| 25166570 | Apr. 4, 2025 | Gold Bond Age Renew Crepe Corrector | Dry skin; pruritus; macular rash; scar; thermal burn |
| 25014839 | Feb. 25, 2025 | Gold Bond Crepe Corrector Age Renew | Eye swelling; hypersensitivity |
| 24318708 | Sept. 12, 2024 | Gold Bond Age Renew Tight & Firm Body & Face Lotion | Application-site rash; pruritic rash |
| 24237134 | Aug. 21, 2024 | Gold Bond Ultimate Healing Hydrating Lotion With Aloe | Pain; pruritus; rash |
| 23998409 | June 20, 2024 | Gold Bond Body Bright Body & Face Lotion | Application-site burn; hypersensitivity; eye swelling; mouth swelling; pruritus; skin exfoliation |
| 23861766 | May 15, 2024 | Gold Bond Crepe Corrector Age Renew Lotion | Chemical burn of skin; pruritus; rash |
| 23850499 | May 3, 2024 | Gold Bond Retinol Overnight Body & Face Lotion | Dry skin; edema; pruritus; macular rash; skin exfoliation |
| 23752724 | Apr. 3, 2024 | Gold Bond Healing Sensitive Daily Body & Face Lotion | Pruritus; erythematous rash |
| 23588123 | Feb. 23, 2024 | Gold Bond Neck & Chest Firming Cream | Erythematous rash; pruritic rash; skin irritation |
| 23544164 | Feb. 20, 2024 | Gold Bond Retinol Overnight Body & Face Lotion | Application-site burn; application-site rash |

79. These reports further corroborate that consumers were reporting serious skin irritations and medical problems in connection with the Products. Defendant knew or should have known of the recurring reports, yet continued to market and sell the Products using the Delicate Formulation and Fragrance Free Representations.

## G. Defendant's Labeling Violates Federal and California Cosmetic Labeling Law

80. The federal Food, Drug, and Cosmetic Act ("FDCA") deems a cosmetic misbranded if "its labeling is false or misleading in any particular." 21 U.S.C. § 362(a). The Products are

---

[96] FDA, *Adverse Event Monitoring System Public Dashboard for Cosmetic Products*, line listing downloaded July 30, 2026; see FDA, *FDA Launches Real-Time Adverse Event Reporting Dashboard for Cosmetic Products* (Sept. 5, 2025), https://www.fda.gov/news-events/press-announcements/fda-launches-real-time-adverse-event-reporting-dashboard-cosmetic-products.

cosmetics within the meaning of 21 U.S.C. § 321(i) and false and misleading for the reasons set forth herein.

81.    Plaintiffs' state-law claims are independently grounded in California's Sherman Food, Drug, and Cosmetic Law and the Unfair Competition Law, which parallel but do not depend on the FDCA. The FDCA provisions alleged above are offered as evidence of Defendant's conduct and as predicate unlawful acts supporting the UCL's unlawful prong—not as the sole basis for any state-law claim. Plaintiffs' claims would exist under the Sherman Law and the UCL regardless of the FDCA, because California's cosmetic misbranding and false-advertising statutes impose obligations coextensive with, but independent from, those the FDCA imposes.

82.    Defendant's marketing, advertising, and sale of the Products violate the misbranding provisions of the Sherman Law applicable to cosmetics (Cal. Health & Safety Code § 111730, *et seq.*), including but not limited to:

(a) Section 111730 (a cosmetic is misbranded if its labeling is false or misleading in any particular),

(b) Section 111735 (a cosmetic is misbranded if its labeling or packaging does not conform to the requirements of Chapter 4), in that the Products' labeling fails to conform to Chapter 4's prohibition on false and misleading advertising at Section 110390;

(c) Section 111745 (a cosmetic is misbranded if any word, statement, or other information required to appear on the label or labeling is not prominently placed with such conspicuousness as to render it likely to be read by the ordinary consumer);

(d) Section 111765 (it is unlawful for any person to manufacture or sell any cosmetic that is misbranded); and

(e) Section 111770 (it is unlawful for any person to misbrand any cosmetic).

83.    Defendant's marketing, advertising, and sale of the Products also violate the false-advertising provisions of the Sherman Law (Cal. Health & Safety Code § 110390, *et seq.*), including but not limited to:

(a) Section 110390 (it is unlawful for any person to disseminate any false advertisement of any cosmetic);

(b) Section 110395 (it is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any cosmetic that is falsely advertised); and

(c) Sections 110398 and 110400 (it is unlawful for any person to advertise any cosmetic that is adulterated or misbranded, and unlawful to receive in commerce any falsely advertised cosmetic or to deliver or proffer for delivery any such cosmetic).

**H.     RULE 9(b) Allegations**

**(a) WHO:** Defendant Chattem, Inc.

**(b) WHAT:** Defendant's conduct was, and continues to be, false, deceptive, and misleading because Defendant makes the Delicate Formulation Representations and Fragrance Free Representations while omitting and concealing that the Products contain the recognized allergens, irritants, fragrances, and fragrance-function ingredients described herein. Exact Product-level representations and ingredient declarations appear in Exhibit A. These representations and omissions were material to Plaintiff and the Classes.

**(c) WHEN:** Defendant made the material misrepresentations and omissions throughout the Class Period, including immediately before and at the time of Plaintiff's March 18, 2026 purchase.

**(d) WHERE:** On the Products' labels and packaging and throughout Defendant's online marketing, including Amazon.com Product titles, variant selectors, structured product attributes, carousel images and claim badges, "About this item" sections, Product Descriptions, A+ panels, and seller-answered questions and answers.

**(e) HOW:** By prominently making the Representations in claim-bearing portions of the Products' labels, packaging, and online marketing, thereby conveying that the Products are formulated to reduce allergic reactions or irritation and, for the supported Products, contain no ingredient that functions as fragrance.

**(f) INJURY:** Plaintiff and members of the Classes purchased, and paid a premium for, Products they would not have purchased—or for which they would have paid substantially less—absent Defendant's misrepresentations and omissions.

**I.     Plaintiff Lacks an Adequate Remedy at Law**

84.     Plaintiff lacks an adequate remedy at law for the future harm described above. Damages cannot remedy Plaintiff's inability to rely on Defendant's Representations when deciding whether to purchase the Products in the future. Only injunctive relief requiring Defendant to cease or correct the misleading Representations can address that prospective harm.

85.     Equitable relief is also necessary because legal remedies may prove inadequate to provide complete relief, including restitution measured by the difference between the price Plaintiff and the Classes paid and the value of the Products as received, and disgorgement of revenues Defendant unfairly obtained, which are equitable remedies not necessarily coextensive with damages.

86.     Equitable relief is additionally appropriate because the statutes of limitations for the asserted causes of action vary. The UCL and FAL carry four-year limitations periods, which may reach purchases not fully remediable under other causes of action.

87.     The scope of actionable misconduct under the FAL and UCL is also broader than under the other causes of action asserted herein. The FAL and UCL prohibit Defendant's fraudulent marketing scheme. Plaintiff's warranty and common-law claims, on the other hand, are more limited, focusing on the specific duties and obligations arising from Defendant's misrepresentations and omissions at the point of purchase. The UCL also creates a cause of action for violations of laws that do not themselves provide for a private cause of action — including the FTC's prohibition on unfair and deceptive acts in the labeling of consumer products

## CLASS ALLEGATIONS

88.     Plaintiff brings this action on behalf of herself and all others similarly situated under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3). Plaintiff seeks to represent the following Classes:

> **Nationwide Class:** All persons in the United States who, during the
>
> maximum period permitted by law, purchased one or more of the
>
> Products for personal use.

**California Subclass:** All persons in California who, during the maximum period permitted by law, purchased one or more of the Products for personal use.

**Multi-State Consumer Protection Subclass:** All persons who, during the maximum period permitted by law, purchased one or more of the Products for personal use in a state with a consumer-protection statute materially similar to the statutes identified herein.

**Multi-State Warranty Subclass:** All persons who, during the maximum period permitted by law, purchased one or more of the Products for personal use in a state with express-warranty law materially similar to the laws identified herein.

89. The Classes exclude (1) Defendant and its officers, directors, employees, and subsidiaries; (2) the judges and court personnel assigned to this case and their immediate families; and (3) Plaintiff's and Defendant's counsel and their employees.

90. Plaintiff reserves the right to amend the class definitions and add or modify subclasses as appropriate based on further investigation, discovery, and the specific theories of liability.

91. *Numerosity:* The exact number of members of the Classes is presently unknown and can be determined only through discovery, but, upon information and belief, the Classes contain thousands of members. Joinder is impracticable.

92. ***Existence and Predominance of Common Questions of Law and Fact:*** Common questions exist and predominate over individual questions, including:

(a) Whether the Delicate Formulation Representations convey that the Products are formulated to reduce allergic reactions or irritation;

(b) Whether the Delicate Formulation Representations are false or misleading in light of the Products' allergens and irritants;

(c) Whether the supported Fragrance Free Representations are false or misleading because the Products expressly list "Fragrance" or contain ingredients documented to function as fragrances, masking agents, or aromatic materials;

(d) Whether the Representations were uniformly disseminated through materially similar labels, packaging, and online marketing;

(e) Whether the Representations were material to reasonable consumers;

(f) Whether Defendant was unjustly enriched;

(g) Whether Plaintiff and members of the Classes suffered economic injury and the measure of relief.

93. *Typicality:* Plaintiff's claims are typical because she purchased A1, a Product bearing both groups of Representations, in reliance on those Representations, and suffered the same economic injury arising from the same course of conduct challenged on behalf of the Classes.

94. *Adequacy:* Plaintiff will fairly and adequately represent and protect the interests of the Classes. Her interests do not conflict with those of absent members, and she has retained counsel experienced in consumer-protection and complex class litigation.

95. *Superiority:* A class action is superior to other available methods because individual damages are relatively small, separate actions would be economically impracticable and risk inconsistent adjudications, and common evidence concerning Defendant's formulations, labeling, marketing, sales, and knowledge can efficiently resolve the central issues.

## CAUSES OF ACTION

### COUNT I
**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code § 1750, *et seq.***
**(On Behalf of Plaintiff and the California Subclass)**

96. Plaintiff incorporates by reference each preceding allegation as though fully set forth herein.

97. Plaintiff brings this claim individually and on behalf of the California Subclass.

98. Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

99. Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another."

100.    Civil Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

101.    Defendant violated these provisions by making the Delicate Formulation and Fragrance Free Representations notwithstanding the Products' recognized allergens, irritants, fragrances, and fragrance-functioning ingredients. Defendant knew or should have known the Products' formulations and the functions and risks documented for their ingredients.

102.    Defendant's conduct constituted, and continues to constitute, a course of conduct in violation of the CLRA.

103.    On March 24, 2026, Plaintiff sent Defendant a pre-suit notice under Civil Code § 1782 identifying the violations and demanding correction. Defendant did not respond or cure the challenged conduct within 30 days.

104.    Pursuant to California Civil Code §§1780(a)(1)-(5) and § 1780(e), Plaintiff seek monetary damages from Defendant, reasonable attorneys' fees and litigation costs, an injunction and any other relief the Court deems proper under the CLRA.

## COUNT II
### Violation of California's Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### (On Behalf of Plaintiff and the California Subclass)

105.    Plaintiff incorporates by reference each preceding allegation as though fully set forth herein.

106.    Plaintiff brings this claim individually and on behalf of the California Subclass.

107.    Defendant violated the UCL, Cal. Bus. & Prof. Code §§ 17200–17210, by engaging in unlawful, unfair, and fraudulent business acts and practices.

108.    The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. A business practice is unlawful if it violates established state or federal law; fraudulent if members of the public are likely to be deceived; and unfair if it offends established public policy or causes substantial consumer injury not outweighed by countervailing benefits.

109. Defendant's conduct is unlawful because it violates the CLRA, FAL, the Sherman Food, Drug, and Cosmetic Law, including Cal. Health & Safety Code §§ 110390, 110395, 110398, 110400, 111730, 111735, 111765, and 111770, and the parallel federal cosmetic-labeling provisions described above.

110. Defendant's conduct is fraudulent because the Delicate Formulation Representations are likely to deceive reasonable consumers into believing that the Products are formulated to reduce allergic reactions or irritation, and the Fragrance Free Representations are likely to deceive reasonable consumers into believing that the supported Products contain no ingredients that function as fragrance.

111. Contrary to those Representations, the Products contain the recognized allergens and irritants detailed herein, and the supported Fragrance Free Products expressly list "Fragrance" or contain documented fragrance-functional ingredients.

112. Defendant's conduct is unfair because it is substantially injurious to consumers, offends established policies against deceptive cosmetic labeling and advertising, and is immoral, unethical, oppressive, or unscrupulous. There is no utility in misrepresenting a cosmetic's formulation or the presence of ingredients that function as fragrance.

113. Plaintiff and members of the Classes suffered substantial injury by purchasing Products they would not have purchased, or for which they would have paid less, absent Defendant's conduct.

114. The gravity of Defendant's conduct outweighs any justification, particularly because Defendant could accurately qualify its claims, omit the challenged Representations, or reformulate the Products.

115. Plaintiff and members of the Classes could not reasonably avoid their injury. They were entitled to rely on Defendant's prominent Representations and lacked the specialized knowledge necessary to identify the ingredients' allergenicity, irritancy, fragrance functions, or undisclosed constituents.

116. Under Cal. Bus. & Prof. Code § 17203, Plaintiff and the California Subclass seek restitution, injunctive relief, attorneys' fees, and all other appropriate relief.

**COUNT III**
**Violation of California's False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code § 17500, *et seq.***
**(On Behalf of Plaintiff and the California Subclass)**

117.    Plaintiff incorporates by reference each preceding allegation as though fully set forth herein.

118.    Plaintiff brings this claim individually and on behalf of the California Subclass.

119.    Defendant disseminated the Delicate Formulation and Fragrance Free Representations through the Products' labels, packaging, Amazon listings, and other marketing. Those statements were false or misleading for the reasons alleged herein and were likely to deceive reasonable consumers.

120.    Contrary to the Delicate Formulation Representations, the Products contain the recognized allergens and irritants detailed herein. Contrary to the supported Fragrance Free Representations, the Products expressly list "Fragrance" or contain documented fragrance-functional ingredients.

121.    Defendant disseminated materially similar advertising across California and the United States. The advertising was unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq.*

122.    Defendant's continued dissemination of the Representations is likely to deceive the consuming public.

123.    Defendant knew, or in the exercise of reasonable care should have known, that the advertising was false or misleading because Defendant formulated the Products and controlled their ingredient declarations and marketing. Plaintiff and the California Subclass relied on the materially misleading advertising and lost money as a result, in an amount to be proven at trial.

**COUNT IV**
**Violation of State Consumer Protection Statutes**
**(On Behalf of Plaintiff and the Multi-State Consumer Protection Subclass)**

124.    Plaintiff incorporates by reference each preceding allegation as though fully set forth herein.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                             47

125. Plaintiff brings this claim individually and on behalf of the Multi-State Consumer Protection Subclass.[97]

126. Defendant's acts and practices deceived, and are likely to continue deceiving, members of the Multi-State Consumer Protection Subclass and the public because Defendant made the Delicate Formulation and Fragrance Free Representations while selling Products containing the contrary ingredients detailed herein.

127. The foregoing conduct was directed at consumers and was material because it misrepresented the Products' formulation, composition, fragrance functions, and value.

128. Plaintiff and members of the Multi-State Consumer Protection Subclass seek actual damages, statutory damages, punitive damages where available, reasonable attorneys' fees and costs, and all other relief permitted by law.

## COUNT V
### Breach of Express Warranty
### (On Behalf of the Multi-State Warranty Subclass)

129. Plaintiff incorporates by reference each preceding allegation as though fully set forth herein.

---

[97] While discovery may alter the following, Plaintiff asserts that states with materially similar consumer-protection laws under the facts alleged include: Alaska Stat. § 45.50.471, *et seq.*; Ariz. Rev. Stat. §§ 44-1521, *et seq.*; Ark. Code § 4-88-101, *et seq.*; Cal. Bus. & Prof. Code § 17200, *et seq.*; Cal. Civ. Code § 1750, *et seq.*; Colo. Rev. Stat. Ann. § 6-1-101, *et seq.*; Conn. Gen. Stat. Ann. § 42-110, *et seq.*; 6 Del. Code § 2513, *et seq.*; D.C. Code § 28-3901, *et seq.*; Fla. Stat. Ann. § 501.201, *et seq.*; Ga. Code Ann. § 10-1-390, *et seq.*; Haw. Rev. Stat. § 480-2, *et seq.*; Idaho Code Ann. § 48-601, *et seq.*; 815 ILCS 501/1, *et seq.*; Ind. Code § 24-5-0.5-2, *et seq.*; Kan. Stat. Ann. § 50-623, *et seq.*; Ky. Rev. Stat. Ann. § 367.110, *et seq.*; La. Rev. Stat. § 51:1401, *et seq.*; Me. Rev. Stat. tit. 5, § 207, *et seq.*; Md. Code Ann., Com. Law § 13-301, *et seq.*; Mass. Gen. Laws ch. 93A, *et seq.*; Mich. Comp. Laws § 445.901, *et seq.*; Minn. Stat. § 325F, *et seq.*; Mo. Rev. Stat. § 407, *et seq.*; Neb. Rev. Stat. §§ 59-1601, *et seq.*; Nev. Rev. Stat. § 41.600, *et seq.*; N.H. Rev. Stat. § 358-A:1, *et seq.*; N.J. Stat. Ann. § 56:8, *et seq.*; N.M. Stat. Ann. § 57-12-1, *et seq.*; N.Y. Gen. Bus. Law § 349, *et seq.*; N.C. Gen. Stat. § 75-1.1, *et seq.*; N.D. Cent. Code § 51-15, *et seq.*; Ohio Rev. Code § 1345.01, *et seq.*; Okla. Stat. tit. 15, § 751, *et seq.*; Or. Rev. Stat. § 646.605, *et seq.*; 73 Pa. Stat. § 201-1, *et seq.*; R.I. Gen. Laws § 6-13.1-5.2(B), *et seq.*; S.C. Code §§ 39-5-10, *et seq.*; S.D. Codified Laws § 37-24-1, *et seq.*; Tenn. Code § 47-18-101, *et seq.*; Tex. Bus. & Com. Code § 17.41, *et seq.*; Utah Code § 13-11-175, *et seq.*; 9 V.S.A. § 2451, *et seq.*; Va. Code § 59.1-199, *et seq.*; Wash. Rev. Code § 19.86.010, *et seq.*; W. Va. Code § 46A, *et seq.*; Wis. Stat. § 100.18, *et seq.*; and Wyo. Stat. § 40-12-101, *et seq.*

---

130. Plaintiff brings this claim individually and on behalf of the Multi-State Warranty Subclass.[98]

131. Plaintiff and members of the Multi-State Warranty Subclass formed contracts with Defendant when they purchased the Products. Alternatively, no direct privity is required because they relied on Defendant's written representations on Product packaging and official online listings, which Defendant intended purchasers to review and rely upon.

132. The contracts included the Delicate Formulation and Fragrance Free Representations applicable to each purchased Product.

133. The Representations constituted affirmations of fact and express warranties and became part of the basis of the bargain.

134. Defendant breached those warranties because the Products contained the recognized allergens, irritants, generic fragrance mixtures, and fragrance-function ingredients detailed herein and therefore did not conform to the Representations.

135. Plaintiff provided Defendant with timely pre-suit notice of the breaches alleged herein.

136. Plaintiff and members of the Multi-State Warranty Subclass performed all conditions precedent by purchasing the Products.

137. Plaintiff and members of the Multi-State Warranty Subclass would not have purchased the Products on the same terms had they known the truth.

---

[98] While discovery may alter the following, Plaintiff asserts that states with materially similar express-warranty laws under the facts alleged include: Alaska Stat. § 45.02.313; Ariz. Rev. Stat. § 47-2313; Ark. Code § 4-2-313; Cal. Com. Code § 2313; Colo. Rev. Stat. § 4-2-313; Conn. Gen. Stat. § 42a-2-313; 6 Del. C. § 2-313; D.C. Code § 28:2-313; Ga. Code § 11-2-313; Haw. Rev. Stat. § 490:2-313; Idaho Code § 28-2-313; 810 ILCS 5/2-313; Ind. Code § 26-1-2-313; Kan. Stat. § 84-2-313; Ky. Rev. Stat. § 355.2-313; 11 Me. Rev. Stat. § 2-313; Mass. Gen. Laws ch. 106, § 2-313; Minn. Stat. § 336.2-313; Miss. Code § 75-2-313; Mo. Rev. Stat. § 400.2-313; Mont. Code § 30-2-313; Neb. Rev. Stat. § 2-313; Nev. Rev. Stat. § 104.2313; N.H. Rev. Stat. § 382-A:2-313; N.J. Stat. § 12A:2-313; N.M. Stat. § 55-2-313; N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat. § 25-2-313; N.D. Cent. Code § 41-02-30; Ohio Rev. Code § 1302.26; Okla. Stat. tit. 12A, § 2-313; Or. Rev. Stat. § 72.3130; 13 Pa. Cons. Stat. § 2313; R.I. Gen. Laws § 6A-2-313; S.C. Code § 36-2-313; S.D. Codified Laws § 57A-2-313; Tenn. Code § 47-2-313; Tex. Bus. & Com. Code § 2.313; Utah Code § 70A-2-313; 9A V.S.A. § 2-313; Va. Code § 59.1-504.2; Wash. Rev. Code § 62A.2-313; W. Va. Code § 46-2-313; and Wyo. Stat. § 34.1-2-313.

---

138. As a result, Plaintiff and members of the Multi-State Warranty Subclass suffered economic injury and are entitled to damages, costs, interest, and fees as allowed by law.

## COUNT VI
### Unjust Enrichment
### (On Behalf of the Nationwide Class)

139. Plaintiff incorporates by reference each preceding allegation as though fully set forth herein.

140. Plaintiff brings this claim individually and on behalf of the Nationwide Class under California law or, alternatively, under the laws of the states in which Nationwide Class members purchased the Products.

141. To the extent required, Plaintiff pleads unjust enrichment in the alternative under Federal Rule of Civil Procedure 8.

142. Plaintiff and members of the Nationwide Class conferred a benefit on Defendant in the form of money paid for the Products.

143. Defendant was unjustly enriched by retaining those revenues because it sold the Products through materially misleading Delicate Formulation and Fragrance Free Representations.

144. Plaintiff and members of the Nationwide Class suffered injury in fact and lost money as a result and are entitled to restitution and disgorgement of the profits Defendant unjustly retained.

## PRAYER FOR RELIEF

145. WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests judgment against Defendant as follows:

(a) Certifying the Classes under Federal Rule of Civil Procedure 23, appointing Plaintiff as class representative, and appointing Plaintiff's counsel as Class Counsel;

(b) Declaring that Defendant's conduct violates the laws identified herein;

(c) Entering judgment in favor of Plaintiff and the Classes on all counts;

(d) Awarding compensatory, statutory, and punitive damages in amounts to be determined at trial, except that Plaintiff does not presently seek damages under the CLRA;

(e) Awarding prejudgment and post-judgment interest;

(f) Awarding restitution, disgorgement, and all other equitable monetary relief;

(g) Granting injunctive relief as pleaded or as the Court deems appropriate;

(h) Awarding reasonable attorneys' fees, expenses, and costs; and

(i) Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: July 31, 2026

Respectfully submitted,

**GUCOVSCHI LAW FIRM, PLLC.**
By: */s/ Adrian Gucovschi*
Adrian Gucovschi (State Bar No. 360988)
Nathaniel Haim Sari (State Bar No. 362634)
165 Broadway, Fl. 23
New York, NY 10006
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gucovschilaw.com
nathaniel@gucovschilaw.com

*Attorneys for Plaintiff*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Adrian Gucovschi, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court. I am a partner at Gucovschi Law Firm, PLLC, counsel of record for Plaintiff in this action. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code § 1780(d) because a substantial portion of the transaction alleged in the Complaint occurred in this District.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Miami, Florida, on July 31, 2026.

/s/ *Adrian Gucovschi*
Adrian Gucovschi